## James P. McCabe, Plff. in Err., v. Commonwealth of Pennsylvania.

On the trial of an indictment for murder,—*Held*, that circumstantial evidence of the date of the murder, of the possession of money by the accused after the murder and the want of it before, and evidence of the conduct and voluntary declarations of the accused, and of the appearance of the wounds on the person of the murdered man, as indicating premeditated murder, was proper.

*Held*, also, that when the prosecution produces a witness in court, without examining him as to a particular point, but gives the accused an opportunity to examine him on that point, it cannot be charged with suppressing his testimony.

*Held*, also, that no legal presumption arises that blood upon an ax found near the body of the murdered man was human blood; that circumstantial evidence is admissible to contradict the positive testimony of witnesses; and that the effect of the failure of the prosecution to produce certain papers was a question for the jury.

If counsel neglect to call the attention of the trial judge to the instructions they require, this court will not reverse on account of such omissions unless they are of a more serious character than those found in this case.

(Argued October 4, 1886. Decided October 18, 1886.)

July Term, 1886, No. 109, E. D. Error to the Court of Oyer and Terminer of Wayne County to review a judgment on conviction of murder in the first degree. Affirmed.

NOTE.—It has been said that all witnesses to the crime should be called by the commonwealth. Rice v. Com. 102 Pa. 408; Donaldson v. Com. 95 Pa. 21. On the other hand it has been held to be discretionary with the court to so order. Onofri v. Com. 20 W. N. C. 264. Such may be refused

The facts and questions raised are fully set out in the following charge to the jury in the court by Seeley, P. J.

The defendant is charged before you with the crime of murder. Murder is the unlawful and malicious taking of human life. Whether this defendant is guilty of this offense is for you to determine from the evidence in the case. Before the commonwealth may ask you to render a verdict of guilty she must satisfy you by evidence, beyond a reasonable doubt, of the guilt of the defendant.

The law presumes the innocence of every man, and that presumption remains until it is rebutted by competent evidence.

A reasonable doubt as to the guilt of the defendant inures to his benefit and would require of you a verdict of acquittal.

Now, what is a reasonable doubt? What do we mean by this term which is so frequently used in criminal proceedings?

It is more easy to describe it in some of its aspects than it is to define it. Various attempts have been made, with greater or less success, to produce a definition of this term "reasonable doubt." It is a doubt, where the mind hesitates because it is not convinced; not where a convinced mind hesitates because of fear of consequences in declaring its conclusion. That is not doubt, that is timidity. It is not only a doubt; it is a reasonable doubt which inures to the benefit of the defendant; a rational doubt. That is, it must not be fanciful, conjured by an overwhelming sense of responsibility or apprehension of consequences, but must arise out of the evidence in the case.

It exists where the careful consideration of all the evidence leaves upon the mind an honest and conscientious difficulty in believing; where the evidence by reason of its insufficiency or want of credibility fails to convince the mind.

You are not to place your minds in an attitude of resistance, and so doubt because you are unwilling to be convinced, and so, as jurors, refuse to be convinced by evidence which would convince you as men.

---

when the evidence is merely cumulative (Com. v. Keller, 191 Pa. 122, 43 Atl. 198); or where the evidence may be submitted by the defendant (Com. v. Morrison, 193 Pa. 613, 44 Atl. 913). In Com. v. Fry, 198 Pa. 379, 48 Atl. 257, the lower court refused to order the calling of defendant's son, who was the only other witness of the crime, and he was subsequently called for the defense. See also editorial note to Cartier v. Troy Lumber Co. 14 L. R. A. 470, presenting the authorities as to presumptions arising from failure to produce evidence. As to presumptions arising against destroyer of evidence, see editorial note to Hay v. Peterson, 34 L. R. A. 581.

The grave interests which depend upon your verdict may well require of you the greatest carefulness in the scrutiny of the evidence, lest it may lead you to an erroneous conclusion, but they neither call for nor warrant timidity on your part in consideration of, nor antagonism to, the influence of the evidence.

Simple preponderance of evidence, inclining you to believe in the guilt of the defendant, will not justify a verdict of guilty; nor is the commonwealth required to establish such guilt beyond the possibility of doubt; such certainty is unattainable usually in such proceedings.

The law presumes every man to be innocent, as we have said, and that presumption must remain until, by evidence, guilt is established beyond a reasonable doubt.

It has been said in the argument of this case that circumstantial evidence leads to conjecture, and not to positive conclusions. Circumstantial evidence may possess every degree of force, from that which excites the slightest suspicion to that which leads unmistakably to a positive conclusion of guilt. Circumstantial evidence may be very unsatisfactory or it may be of the most satisfactory character in its results. Each single fact may seem almost trifling in itself, and yet such a combination of circumstances may be shown positively, as will exclude every hypothesis except the one asserted. Every case depending on circumstantial evidence must be judged by itself and stand or fall by the particular facts shown in that particular case.

Was there a murder committed? There seems little doubt upon this subject. The counsel both for the commonwealth and the defendant express the opinion that a murder was committed, and express an opinion that it was a deliberate, premeditated murder—murder in the first degree.

When was it committed? You have, in the evidence, the narrative of what occurred at the house of James D. Tully on the night of Wednesday, the 30th of December, the situation of the parties there, the conversations which occurred, the leaving of the parties somewhere in the neighborhood of 10 o'clock at night. This, so far as the evidence in this case discloses, is the last that was seen of Michael Reilly alive. On Friday morning he is found lying by the roadside, a few rods from his house, gaping wounds upon his head, his clothing stiff with frost, dead. When did he die, and by whose hands?

[On Thursday morning James Tully went to the house of

Michael Reilly; he did not find him about his house or premises, he stamped upon the porch, he shouted, called to him; no voice answered, no person appeared in response. Where was Michael Reilly on the morning of December 31? In all that community no person appears who saw him on that day. This is one of the circumstances relied upon to determine the date of this homicide. Another of the circumstances is the condition of Michael Reilly's house and of the matters in and about it, the stable, the condition of the cattle there, the amount of droppings that are shown to have lain there, the condition of the house, the three pans of milk that are shown to have been in the kitchen upon chairs, just as seen by James Tully on the morning of Thursday, the condition of the body, its indication of the time since death ensued, as testified to by the physician; the condition of the blood, whether it indicated recent or remote death, and upon this question you have had a large amount of testimony by physicians, and it is for you to consider whether bearing in favor of the theory of the commonwealth or in favor of the theory of the defense. Does it indicate to your minds anything with reference to the length of time which had passed since the death of Michael Reilly? The condition of the road with reference to tracks, whether you find in that evidence anything which can assist you to a judgment as to whether this transaction occurred before the rain of Thursday set in, or afterwards.

In this connection you will remember what is said as to the condition of the road on Friday morning, that it was frozen so that it would bear a man. You will remember also, the condition as to grass upon this Tully road, which is testified to, which might prevent the discovery of a track, if made upon the sod. Taking it altogether, does it assist you to a conclusion as to how long this body had remained by that roadside? The witness of the clothing of the deceased, its condition, the discharge of the blood upon the snow, all these are circumstances which are placed in evidence here for the purpose of assisting you to determine when the deed was committed.

On the other hand, James Tully testifies before you that he passed down and back over that road on Thursday and that he saw no such body; in his judgment, he says, no such body was there. He testifies that the feet of this body came out across the path over which he walked. You will take in connection with his evidence what he said to John Reilly, as he testified

upon the stand, what other witnesses have said as to whether the feet of this body did project across the path or not, how far they concur in supporting the testimony of James Tully, or are inconsistent with it; and from all the circumstances bearing upon the question, you must determine whether this killing was done on the night of Wednesday or whether it was done at some time subsequent to the passing of James Tully over that road. If the latter, if Michael Reilly was not killed before James Tully passed over this road on Thursday morning then this defendant must be acquitted, nothing in the case would warrant a verdict of guilty against him.] If, on the other hand, this body was lying there at the time, then you must proceed to the consideration as to how this killing was done and by whose hands.

With what instrument was it done? With a view to assist you in determining this question, the wounds upon the body of Michael Reilly have been described, two wounds upon the head, incised wounds, other contused wounds upon the head and body, so described as to indicate the use of an instrument with a sharp cutting edge, and also of an instrument with a flat, nearly rectangular surface like, as has been suggested, the edge and poll of an ax. Was it done with an ax? And if so, what ax? Three axes have been produced in evidence here, and two of them have been especially examined. One is the ax belonging to Michael Reilly, the deceased, and the other the ax belonging to the defendant, James P. McCabe. You have the description of the size and shape of the contused wounds upon the head and body, from various witnesses. I do not remember that any witness testified to having made a measurement of any of the contused wounds.

If these wounds are of such size and shape that they could not be made with the ax produced in evidence as the ax of this defendant, then that ax is excluded from further consideration. Whether they could or not, is a question which you must determine from the evidence. If they could, then the circumstances of the placing of this ax over the fence, near the hotel of William Flynn, may become of some importance in the case. Was this a concealment of the ax, or was it a natural act for a person to perform, an innocent person in the condition of the defendant on that night, or at whatever time it was placed there? If this ax is excluded from your consideration, then who was the person using the instrument by which this death was occasioned,

no matter what that instrument may have been? And upon that question all evidence in the case comes to you for your consideration.

The commonwealth says that this defendant committed this crime for the purpose of obtaining money. As bearing upon that question, much evidence has been introduced with reference to the financial condition of the defendant, perhaps more evidence than ought to have been introduced upon either side. This evidence, however, is for you; it is of no consequence in the case except so far as it assists your mind to a conclusion as to whether this defendant possessed money immediately preceding the death of Michael Reilly, or not. How large a farm he may have had, what crops, what stock, is of no consequence, unless the farm, or the stock, or the crops produced money, which was in his possession on the night of Wednesday, the 30th of December. What judgments existed against him, what demands were made upon him, is of no consequence unless these judgments took from him money, which he might otherwise have had in his possession on the night of the 30th of December. This is the question: Did he, or did he not, have this money in his possession, before the homicide, which was found on his person afterwards?

Now, you have some testimony with reference to the money in the possession of Michael Reilly. Mrs. Reilly left her home on the 24th, and testifies that a week prior to that she saw a certain amount of money in her husband's hands, and also a check. Mr. Sherwood testifies to having changed that check subsequently, and delivered the money to Michael Reilly. A wallet is produced here, which is identified as the wallet belonging to Michael Reilly. Mrs. Reilly testified that it was usually kept in the middle top drawer of the bureau, which had been mentioned, and that this drawer was kept locked. When the parties went to the house of Michael Reilly, on the first day of January, no indication of disturbance about the house was presented, nothing to show that his house had been entered. This drawer was locked; upon being opened there was found in it some $15 in gold with a little change, if I remember correctly, and three notes belonging to the deceased.

And now, gentlemen, let me say here, that you are not to be influenced by any suggestion as to the evidence in this case that may come from the court. If our recollection of this evidence

is at all at fault, you will take the evidence as it is and not as it may seem to us at present.

[Subsequently that pocketbook was found in another place. Where did it come from? Where was it on the night of December 30? Was it in that drawer and taken from that drawer? Or was it on the person of Michael Reilly? It was not in the drawer on Friday; there was no appearance of disturbance, and yet it might have been taken from the drawer. These circumstances simply go to you to assist you, with all the circumstances in the case, in determining the issue.]

This defendant had money in October; three or four witnesses testify to this. Hugh Kain saw him have money on the 9th of October, he saw one or more ten and twenty dollar bills. On the 7th of October the defendant loaned another witness twenty dollars. Richard McAvoy says that the defendant sold some stock in October. Charles McAvoy says that he had five dollars of the defendant the latter part of October. I think he says the defendant wanted him to go and get some liquor with it. Mrs. McAvoy says that he handed her five dollars for her child in October; I think she says in October. There may be other evidence of the possession of money by the defendant; nothing further occurs to us at present.

These facts are shown for the purpose of permitting you to believe that the defendant was in the possession of money from other sources, and that it was not necessary to account for the money found in his possession after his arrest by alleging or assuming that it was taken from the person of Reilly.

On the other hand, in November, the commonwealth shows that the tax collector went to James McCabe for his taxes and he did not receive them. He states it as his best recollection that the defendant said he could not pay them at that time. Mr. Ferguson testifies that on the 22d of December, he went to this defendant to collect from him interest which was due, and that the defendant said at that time that he could not pay him then, but that he would pay him in a short time. You will remember that, and you will remember the statement that Mrs. McCabe made in the defendant's presence in that connection.

Now it is said by the defendant, that because Michael Reilly had money on the 24th,—I think Mr. Sherwood paid him money,—of December or at any date prior to this homicide, furnishes no ground of presumption that he had money on the 29th

of December. In other words, that there is no such thing as a continuing presumption of the possession of a circulating medium. Gentlemen, the presumptions with reference to Michael Reilly and James McCabe are the same in this matter. If in one case there is a presumption of the continuance of possession of a circulating medium, that presumption with the same force exists in the other case; and you are to take all this evidence upon both sides in determining whether this homicide was committed for the purpose of robbery and whether a robbery was committed.]

About 11 o'clock, or perhaps a little later, this defendant appeared at the hotel of William Flynn, aroused him from his sleep, and goes into the house, and you have the full account of the defendant's conduct during that night and the following day, Thursday and Thursday night, and Friday morning until he left the house of William Flynn. That he had money at this time the evidence discloses, how much it does not disclose. The purchase of liquor, the offering of a ten-dollar bill to Flynn, the payment of a blacksmith bill, the payment of the bill at the store, the offering of three dollars to one of the witnesses if he would take his team and carry him home, all show the defendant in the possession of money at the time he went to Flynn's hotel, and during the time while he remained there.

[Now there is no attempt to identify this money. It would be a futile attempt if it were undertaken. The simple possession or nonpossession of the money is one of the circumstances in the case, out of which the commonwealth alleged that it has been enabled to establish the defendant's guilt. What weight is to be given that circumstance is for you.]

This pocketbook, found some two weeks later, in the coal shed of William Flynn; how did it come there? Is the circumstance of its being found where it was and when it was found a circumstance which militates against this defendant in any way? You have the construction of this coal house in evidence; the evidence with reference to the rafters, the cobwebs upon the rafters, evidence which is adduced here for the purpose of supporting the theory that this pocketbook was laid up in one of the spaces over the rafters, and that subsequently, from some cause, it dropped from its position upon the floor. Does that theory commend itself to your judgment or does it not? Taking into consideration all the evidence in regard to this building,

how did it get there? For what purpose was it placed there if placed there purposely? Now, we desire not to express any opinion upon this subject, nor upon any other subject growing out of this evidence, but leave the circumstance just as it is detailed to you for you to form your own conclusions with reference to it.

Do you find in all that the defendant said from the time he came to Flynn's house, when he requested him not to tell what time he came there, until the time of his arrest, at his own house; do you find in his conduct, or in his conversation, anything which throws light upon this important question? You have that conduct detailed with some particularity, his declarations to different parties; what he said, what he did and his manner; it is all for you to consider in connection with everything else in the case.

[Now, we come to another aspect of this question, and that is the conduct and declarations of this defendant on Sunday, from the time when the officer with others came to his house for the purpose of making an arrest, and his arrival at Mt. Pleasant, some little time later.] Confessions must be received with great caution. In estimating their value, all the circumstances surrounding the person at the time the confessions were made, must be considered—the condition of the person as to sobriety or intoxication; the influences which are brought to bear upon him, if any, to induce such confession; the opportunities the witnesses had for the exact hearing of the language of the person, and the correctness with which they recollect and detail the statement here in court. These confessions may be of very great consequence or they may be entitled to very slight consideration. In connection with the declarations of this defendant, that he was the murderer of Michael Reilly, you have also the statement from one witness at least, perhaps from others, that he heard the defendant say more than once, that he was not guilty of this crime. Take all the statements together—take all the circumstances into consideration under which they were made—did this defendant intend to acknowledge that he committed this homicide? If he did not, if these words were spoken in some trivial way and he did not intend that they should be taken with their full import, give them what weight they are entitled in your judgment to receive under the circumstances in which they were made. If, on the other hand, this was intended by the de-

fendant, at the time, as a declaration of the fact, and you think that he intended them then with the fullest import against him which they might receive, then consider them in that light in connection with all the evidence in the case, and say whether they determine the defendant's guilt.

The statement of the defendant as to being in the possession of two ten-dollar bills when a larger amount of money was found upon his person—is it entitled to any consideration in your judgment, and does it assist you to reach a conclusion ?

His declaration as to the ax, made on the night of Monday, informing parties where his ax would be found, may be of importance, or it may not, according as you shall think from the other evidence in the case, there was an intent to hide or conceal this ax or not.

The credibility of witnesses is a question entirely for you ; the court has nothing to do with the consideration whether a witness shall be believed or not, or what weight shall be attached to his testimony. You have seen the witnesses on the stand ; you have observed their manner of testifying ; with what degree of frankness and candor they testified ; whether any of them manifested a disposition to withhold facts or to press facts uncalled for upon the attention of the court and jury ; whether you find any indications of bias in the appearance and testimony of any witness. The interest which the witnesses have in this issue, or the apparent interest which they manifest in the issue, their means of observation as to that to which they testify, their accuracy in the detailing of matters as to which they testify, how far they are corroborated or contradicted by known facts, or by other evidence in the case,—these are all matters, gentlemen, that go to you for your consideration to enable you to determine the credibility of witnesses. If you find apparent inconsistencies between the evidence of different witnesses, it is your first duty to reconcile these inconsistencies, if you can do so, upon some reasonable hypothesis. You are not to believe that a man is falsifying upon the witness stand until some conflict, irreconcilable conflict, of evidence forces that belief upon your minds ; but if you find such conflict, then you must determine whom you will believe and whom you will not.

You have the conflict between Hugh Malloy and John Reilly ; it is a matter for you to determine entirely who tells the truth in this matter. If Hugh Malloy tells the truth it would show

such a bias on the part of John Reilly as to justify you in questioning the degree of consideration that ought to be given to his evidence. If, on the other hand, you believe that in that conflict John Reilly is the one that tells the truth and not Hugh Malloy, then his testimony is undisturbed.

The defendant has put in evidence his good character in this case, and this it was his right to do. Every man who lives in a community a life beyond reproach, receiving the confidence and approval of his fellow citizens, has a right to the benefit of that good character when he is accused of a crime in a court of justice. And that character goes into the jury box, not simply as a makeweight where the jury already doubt the guilt of the defendant, but it goes into the jury box as a circumstance to be taken into consideration by the jury, with all the other circumstances, to lead them to a conclusion. Such a character might be shown as, placed by the side of the circumstances indicating guilt, would justify a reasonable doubt of the defendant's guilt without other evidence in his behalf. But the evidence of character goes to you for what it is; it is to be considered by you in connection with the evidence of guilt if you find such evidence; and whether the character raises a reasonable doubt is a matter for your consideration, and not a question upon which we can give you more definite instruction.

If you find this defendant not guilty; if, after a careful consideration of all the evidence, there remains in your mind a reasonable doubt of the defendant's guilt, you would simply render a verdict of not guilty. If, on the other hand, you are satisfied beyond a reasonable doubt as to the guilt of the defendant, then it becomes your duty to determine the degree of this offense.

Homicide may be of various kinds. It may be murder in the first degree, it may be murder in the second degree, or it may be manslaughter in some form.

The simple conclusion of murder rises to no higher point than that of murder in the second degree. We defined murder to you as being the unlawful and malicious killing of a human being. Our statute defines the degrees of murder: "All murder which shall be perpetrated by means of poison or lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed

murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree."

Now, gentlemen, you see clearly the distinction which is made in this act of assembly. Murder perpetrated by means of poison, and murder perpetrated by lying in wait, is deliberate, premed-itated murder. Where the killing is the deliberate act of the person who commits the offense, and the act was performed with an intent to take life, that is premeditated killing. Premeditated killing, whether committed in connection with one of these other felonies or not, is murder of the first degree. Killing committed in the perpetration of or attempt to perpetrate any arson, rape, robbery, or burglary, is murder in the first degree, although the intention to kill did not exist at the time, but the act arose directly in connection with and growing out of the attempt to commit the other offense.

Was this murder deliberate? Was it premeditated? Was there an intent to kill? [We presume men's intentions from their acts. You have had described the wounds upon this body, the gashes in the head, the bruise upon the forehead. Do they indicate a purpose to take life? If they do, then they indicate the commission of premeditated murder, and that is murder in the first degree.]

This question, gentlemen, is a question for you entirely if you find the defendant guilty, to determine the degree of the offense of which he is guilty. It is not necessary that we should say anything to you with reference to the importance of this issue. That profound sense of responsibility which you have manifested during these weeks attests that you are not indifferent upon this question. The interest which has been manifest in this court room, during these days, shows something of the importance which the community attach to this case. Not that this community may urge either conviction or acquittal; not that public sentiment in favor of, or against, this defendant, may influence your verdict. It is not this to which we allude, but to the profound sense of the importance of this issue, which seems to pervade the audience which has been in attendance in this court room during these days. And here, gentlemen, we wish to say that we are informed that that entirely improper expression of approval which we witnessed in this room last night was not intended to express sympathy with or hostility to this defendant, but simply to express courtesy and kind feeling toward the coun-

sel. And we desire to say to you, gentlemen, that personally we have no knowledge as to what the sentiment is which pervades this court room upon this subject, and we care as little as we know. It is not for you, or for us, to be influenced in the silghtest degree by a public sentiment which is fickle as an April day, and which may rest upon no reasonable basis that could be presented for it, which is one thing today and another thing tomorrow. We, under our oath, and you under yours, are to determine this case by the evidence in the case; without malice, without compassion, but simply as the arbiters selected by the defendant and the commonwealth to determine by your verdict the issue which they have seen fit to present to us. This you are bound to do by your oaths.

The serious consequences to this defendant of a verdict of guilty should, as we have already said, lead you to the utmost care in the scrutiny of this evidence, before you declare him guilty. And the important interests of society forbid that you should hesitate to declare, by your verdict, his guilt if, upon a careful review of all the evidence, you are satisfied beyond a reasonable doubt, as to that guilt.

In our determination of questions of law, and in your determinations of questions of fact, our responsibility is a grave one which we cannot evade and to which we should not be insensible, but if we can correctly solve the questions submitted to us we shall therein discharge our duty. Society may not complain of us if one charged with crime is thereby released; and we are not responsible for the consequences to the defendant if they follow from his own criminal conduct.

We sit here to determine this single issue as to the defendant's guilt, not more anxious to convict if guilty than to acquit if his guilt is not proven. This defendant rests as much under the protecting care of the commonwealth as any member of this jury or court. If innocent, he has a right to look to us and to you for protection; if guilty, the duty rests upon us, if that guilt be proven, to declare it.

Now, gentlemen, our duty in this matter is discharged. The responsibility which has rested upon us during the trial of this case now is transferred to you, and the case goes to you for determination with all honesty, with all candor, with all earnestness, seeking that which is right and true. The perpetration of this awful crime was not altogether unseen. He from whose

sight no act is concealed knows how, and by whose hand, Michael Reilly came to his death. May He give you wisdom and guide you in your deliberations, that you may reach a conclusion in accordance with the exact truth.

The defendant has presented certain points in writing upon which we are asked to instruct you.

First—"The conduct of the constable, and those acting with him in the arrest of the defendant, while conveying the defendant from his home to Mt. Pleasant and while they remained there, is deserving of the highest censure and condemnation; and any statement made by the defendant while under and subject to such treatment is unworthy of belief."

*Ans.* In answer to this point we say: We think the conduct of Wm. H. Kain in furnishing liquor to the defendant after his arrest, and in the attempt which he made to induce declarations from this defendant, and the manner in which that attempt was made, is deserving of the most severe condemnation. No man has a right to seek to induce from a defendant statements by any such means; and declarations induced by such influences ought not to be introduced in evidence or be given any consideration in determining the defendant's guilt. We have ruled out by reason of those declarations all that was said with reference to the ax, prior to the time when he made known where his ax could be found. We have refused to rule out the other declarations, for the reason Kain states that his effort was to induce the defendant to state where his ax was to be found, and the reasoning he gives us in this court, commenting on other homicide cases, all goes to the question of the discovery of the weapon. We could not see how these declarations could influence the other statements of the defendant to the effect that he was guilty or not guilty, that he committed the murder or that he did not commit the murder; and therefore we refuse to rule out those declarations because they seem to us not to be induced by the statements of Kain. If, gentlemen, you think we are mistaken and you are of opinion that those declarations were induced by Kain's effort to draw from the prisoner a statement with reference to his ax, then you should dismiss them from your consideration. Your power in this matter rises higher than the power of the court; and we are entirely willing to submit that question to you to consider in connection with these declarations. We recall no

evidence of impropriety on the part of the constable or other person in charge of this defendant.

Second—"The failure and refusal of the commonwealth to ask William H. Kain, the only person who rode with the defendant from the time of his arrest till they reached Mt. Pleasant, what statements, if any, the defendant made while in the company and custody of Kain, was a suppression of material evidence, from which the law presumes that had such evidence been produced it would have been against the commonwealth."

*Ans.* We refuse this request. The commonwealth, for reasons satisfactory to the district attorney, was unwilling to assume the position of making Kain her own witness; we cannot say such reasons were insufficient. The witness was produced in court, the defendant was offered an opportunity to examine him; and in this we think the defendant's rights were fully protected and the commonwealth discharged her entire duty.

Third—"There is no evidence in the case showing that the money, or any portion of it, which was found upon the defendant after his arrest, belonged to the deceased; and in the absence of any such evidence the law presumes that such money belongs to the defendant."

*Ans.* In the absence of proof to the contrary, the law presumes that money lawfully belongs to the possessor of it. Evidence has been presented in this case for the purpose of rebutting that presumption. This evidence does not amount to proof; standing by itself, it is to be taken by you with all the evidence in the case as assisting you to determine whether or not this was the money of Michael Reilly. The point asks us to withdraw that question from your consideration; we cannot do so and therefore the point is refused.

Fourth—"If the jury believe that an ax with blood upon it was found in close proximity to where the body of the deceased was found, at or about the time of the finding of such body; in the absence of the commonwealth's showing by competent tests that such blood was not human blood, the law presumes that it was human blood, and if the jury further believe that the instrument which caused the death of the deceased was an ax—the ax so found is the only ax which the evidence points to as the instrument of death."

*Ans.* We refuse this point. We do not believe that any such presumption arises that the blood upon the ax shown in this case,

found at it was, at the house of Michael Reilly, was human blood.

Fifth—"Where a witness testifies to a material fact or facts and such fact or facts are not contradicted by other testimony in the case and such witness is neither contradicted nor impeached, the jury cannot disbelieve the fact or facts, so testified to; therefore, if the jury believe the testimony of James Tully and the testimony of William Flynn, who testified on the part of the commonwealth, they cannot convict the defendant and the verdict must be not guilty."

*Ans.* We affirm this point so far as to say that, if you believe the body of Michael Reilly was not by the roadside, Thursday forenoon, the 30th of December, as testified to by James Tully, your verdict must be for the defendant. We cannot say that this evidence is uncontradicted, or stands alone by itself. The evidence of the other witnesses as to the location of the footpath and the location of the body upon the footpath, compared with the evidence of James Tully; the circumstances which are alleged in the case, to show that the body of Reilly was there at an earlier date; the declaration of Tully, to John Reilly, that the body may have been there, but he did not see it; and the condition of the witness's eyesight—all go to you, in connection with his direct statement, to enable you to determine whether he is mistaken or not.

Ninth—"The failure of the commonwealth to produce in evidence the notes found in the deceased's drawer, where the money was found, was a suppression of material evidence, from which the law presumes that had it been produced it would be against the commonwealth."

*Ans.* Except as to the word "suppression" implying improper conduct on the part of the commonwealth, we are disposed to affirm this point. We say that it was the duty of the commonwealth to have produced these notes in court, and that in the absence of their production they may be presumed to show something adverse to the commonwealth. Whether they would show the disposition of the entire money of Michael Reilly and relieve this case from the effect of the other circumstances of the absence of the pocketbook from his person and from his bureau drawer, and its presence in another place at a later date and all the other circumstances with reference to the possession or non-possession

of money, is a question that remains entirely with you. to determine.

Tenth—"If the jury believe that the wound in the forehead of the deceased was in size as the evidence of the commonwealth shows it to be, namely : two inches in length, and of the uniform width of one and three sixteenths inches; and if they further believe that the poll of the defendant's ax is, at the extreme outer end, one and one quarter inches in width, and in the middle one and one half inches in width, then it is not possible that such wound was made by the defendant's ax."

*Ans.* This point assumes that the evidence of the commonwealth shows that the wound on the forehead of the deceased was in size two inches in length and of the uniform width of one and three sixteenths inches. The witness, Dr. Kelly, testified that he did not measure the wound but gave its size from simple inspection. Other witnesses have testified as to their recollection of the size and shape of other contusions upon the breast, somewhat similar in form. We cannot say to you that the commonwealth's evidence shows the contusions to be of the uniform width of one and three sixteenths inches, and therefore we refuse this point. If, however, you believe from the evidence that the size of this wound was too small to have been made by the defendant's ax, you would be forced to the conclusion that it was made by some other weapon.

Now, gentlemen, we have answered these points and given you all the assistance that we think we can give you in this case. We simply repeat what we have already said, that the responsibility now rests with you, and that responsibility is to be discharged with a very profound regard for the interests at stake both of the defendant and of society. We have no apprehension that you will fail to entertain a due sense of your responsibility both to the defendant and to society, and to give this case that very careful, conscientious consideration which it deserves.

Gentlemen, the counsel desire to send out certain diagrams that were made, which are alleged to show the size of the polls of these axes, as compared with the size of this contused wound upon the forehead. We propose to place those diagrams in your hands; you will remember in consulting these diagrams just how they were made, and just how they relate to the evidence in the case with reference to the size of the wound, and taking them

into consideration, just as they were created here, give them such weight as they are entitled to.

The jury rendered a verdict of guilty of felony and murder in the first degree. The court overruled defendant's motion for a new trial; and he took this writ, assigning, *inter alia,* as error the portions of the charge inclosed in brackets and the action of the court in its answers to defendant's points.

*Smith & McCarty Bros.* for plaintiff in error.

*F. M. Monaghan,* Dist. Atty., with whom were *P. P. Smith* and *G. G. Waller,* for the commonwealth.

PER CURIAM:

After a careful examination of the several exceptions taken by the counsel for the defendant, to the rulings and charge of the court below, we find none that we can sustain. There are, perhaps, some things omitted from the charge that might well have been in it, but the trial judge cannot think of everything, and if counsel neglect to call his attention, by points properly drawn, to the instructions they require, they may be regarded as unimportant. At all events, we will not reverse on account of such omissions, unless they are of a character more serious than those found in this case. On the whole, the trial was conducted in a legal and fair manner, and so far as we can see the facts warranted the result.

The judgment of the Court of Oyer and Terminer is now affirmed, and it is ordered that the record be returned to that court for execution.