**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ARTHUR MARTIN BOYD, JR.,
Petitioner-Appellant,

v.

JAMES B. FRENCH, Warden, Central

Prison, Raleigh, North Carolina;
MICHAEL F. EASLEY, Attorney
General of North Carolina,
Respondents-Appellees.

No. 97-23

Appeal from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
William L. Osteen, Sr., District Judge.
(CA-89-127-WS-C)

Argued: March 4, 1998

Decided: June 19, 1998

Before MURNAGHAN, ERVIN, and WILKINS, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkins wrote the opinion, in
which Judge Ervin joined. Judge Murnaghan wrote a concurring opin-
ion.

_____

**COUNSEL**

**ARGUED:** James Richard Glover, GLOVER & PETERSEN, P.A.,
Chapel Hill, North Carolina; Thomas Kieran Maher, RUDOLPH &
MAHER, P.A., Chapel Hill, North Carolina, for Appellant. Barry Ste-

ven McNeill, Special Deputy Attorney General, NORTH CARO-
LINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for
Appellees. **ON BRIEF:** Michael F. Easley, Attorney General of
North Carolina, NORTH CAROLINA DEPARTMENT OF JUS-
TICE, Raleigh, North Carolina, for Appellees.

_____

**OPINION**

WILKINS, Circuit Judge:

Appellant Arthur Martin Boyd, Jr. filed this petition for habeas cor-
pus relief[1] from his North Carolina capital conviction and death sen-
tence for the murder of his former girlfriend, 32-year-old Wanda Mae
Phillips Hartman. See 28 U.S.C.A. § 2254 (West 1994).[2] The district
court denied the petition, holding inter alia that the state trial court
committed harmless error in failing to permit Boyd to present mitigat-
ing expert testimony at sentencing. Finding no reversible error in any
of Boyd's numerous arguments, we affirm.

I.

Boyd met Hartman in November 1978 while the two were
employed by the same company. Within days Boyd moved in with
Hartman, and the two resided together for approximately three and
one-half years. In April 1982, Hartman decided to move into her par-
ents' residence with her daughter. Boyd was not supportive of this

_____

[1] Boyd named James B. French, Warden of Central Prison, where Boyd
was then incarcerated, and Michael F. Easley, Attorney General of North
Carolina, as Respondents in this action. For ease of reference, we refer
to Respondents as "the State" throughout this opinion.

[2] Because Boyd's petition for a writ of habeas corpus was filed on Feb-
ruary 16, 1989, prior to the April 24, 1996 enactment of the Antiterro-
rism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No.
104-132, 110 Stat. 1214, amendments to 28 U.S.C.A.§ 2254 effected by
§ 104 of the AEDPA do not govern our resolution of this appeal. See
Lindh v. Murphy, 117 S. Ct. 2059, 2067 (1997). The State does not main-
tain that it has satisfied the opt-in requirements of § 107 such that those
provisions of the AEDPA apply.

2

decision and persistently attempted to reconcile with Hartman. Ultimately, on Friday, July 30, 1982, eight days before the murder, Boyd attempted to visit with Hartman in the front yard of her parents' residence, but Hartman's father, Lawrence Phillips, instructed Boyd "to get off of [his] property and stay off of it." S.J.A. 102. Boyd then threatened Hartman saying, "I'll see you like a German submarine, when you are not expecting it." S.J.A. 103 (internal quotation marks omitted). And, Boyd also told Phillips, "I'll meet you in heaven or hell one day." Id. (internal quotation marks omitted). Following this encounter, Phillips sought a warrant for Boyd's arrest for trespassing, and the warrant was served on Boyd on Monday, August 2.

On the morning of Saturday, August 7, following a night of drinking and drug use, Boyd called Hartman at 8:00 a.m. and talked to her for approximately two hours. During this conversation, Boyd learned that Hartman planned to go to the Mayberry Mall in Mount Airy, North Carolina to shop and attend a church-sponsored car wash. Boyd then went to a bar and began drinking and using drugs again. At approximately 12:00 noon, when the bartender declined to serve him any more alcohol, Boyd hailed a taxi to take him to the mall.

Upon arriving at the mall, Boyd entered a store that sold knives and asked the salesman for a lock-blade knife. The owner of the store testified that "[a] lock-blade knife is a knife that once it's opened it is locked in an open position. It cannot come back against your hands or fingers or cut you in any way. It's locked in." S.J.A. 9. Boyd purchased the knife and left the store.

Boyd then saw Hartman and her mother, approached them, and asked Hartman if she would go outside with him. Boyd and Hartman sat together on a curb outside the mall in close proximity to the ongoing car wash, apparently discussing again the possibility of a reconciliation. After some period of time had passed, at approximately 2:00 p.m., Hartman's mother approached them and indicated that it was time to leave. Hartman stood up, but Boyd attempted to prevent her from leaving, asking her repeatedly to stay with him a few more minutes. Hartman responded to Boyd "that she had lived in hell for three months, that if he was going to kill her just go ahead and kill her and get it over with." S.J.A. 36.

3

Boyd brandished the knife he had just purchased, but offered Hartman assurances that he meant her no harm. Despite these assurances, Boyd began to stab Hartman. As Boyd attacked, Hartman screamed for help and her mother attempted to intervene, trying to pull Boyd away from Hartman. Boyd, however, threw the 76-year-old woman to the ground and resumed his onslaught on Hartman. Forcing Hartman to the ground on her stomach and holding her by her hair, Boyd stabbed her repeatedly. Throughout the attack, numerous witnesses looked on powerless to stop it, including Hartman's shrieking eight-year-old daughter. After stabbing Hartman 37 times, Boyd calmly walked away. He was apprehended quickly as he hid between two parked vehicles; the murder weapon was recovered from where Boyd had thrown it under a nearby automobile.

Emergency medical personnel were summoned and arrived on the scene at approximately 2:20 p.m. These technicians characterized Hartman's condition as requiring advanced life support treatment and explained that they were unable to transport Hartman until they could control her bleeding. They described the extreme difficulty Hartman was having breathing and the severe pain she was experiencing, recounting how Hartman moaned and "rak[ed her hands] back and forth in the dirt" where she was lying. S.J.A. 165. The examining pathologist later identified wounds to Hartman's throat, chest, left thigh, and back. Among these were two wounds that punctured Hartman's right lung, three that pierced her left lung, one that entered her stomach, and one that penetrated her sternum. Additionally, several defensive wounds to Hartman's hands and left arm were present. Loss of blood from these wounds led to hypovolemic shock, and Hartman died of exsanguination while being transported to a hospital.

Boyd was charged with first-degree murder. In light of the numerous witnesses to the murder, Boyd did not dispute that he had inflicted the fatal wounds. However, Boyd presented the testimony of two friends with whom he had been drinking on the morning of the murder and of the bartender who had declined to serve him to support his argument that he was intoxicated at the time of the murder. The jury convicted Boyd of first-degree murder in violation of N.C. Gen. Stat. § 14-17 (1993).

At sentencing, Boyd testified concerning his relationship with Hartman, their break-up, and his attempts at reconciliation. Boyd also

4

professed his love for Hartman, saying, "[It was the m]ost beautiful thing that's ever happened to me. It's the best thing that ever happened in my life. I loved her, more than anybody, I guess, could ever love anybody." J.A. 583. Boyd related that when Hartman ended their relationship, he began to seek mental health assistance because he was having thoughts of killing people, including himself and Hartman. Boyd recounted his almost daily attempts to reunite with Hartman. Further, Boyd explained the difficulties he was experiencing in sleeping and his heavy use of alcohol and illegal drugs.

Boyd also testified concerning various emotional losses he had experienced as a child. Boyd's father deserted their family when Boyd was very young, and his grandfather, with whom he was very close, died when Boyd was five years old. Boyd's mother corroborated the losses of his father and grandfather.

Boyd then called Dr. Jack Humphrey, a professor of criminology at the University of North Carolina.[3] The State objected, and Dr. Humphrey was examined outside the presence of the jury. Dr. Humphrey testified about a study he had performed over a two-year period in conjunction with the North Carolina Department of Corrections. The study had two elements. First, researchers compared prison records, social histories, and psychiatric histories of North Carolina prisoners convicted of homicide with those convicted of property offenses. He concluded that prisoners convicted of homicide had suffered over the course of their lives more stressful events than nonviolent offenders. The second aspect of the study dealt with whether there was a difference between individuals who had killed strangers and individuals who had killed family members or those close to them. Dr. Humphrey concluded that individuals whose victims were close to them tended to have experienced more loss in their lives than those who had killed strangers:

───────────────────────────────────────────────

[3] Dr. Humphrey earned a Ph.D. in sociology with a concentration in criminology from the University of New Hampshire. Employed by the University of North Carolina since 1972, Dr. Humphrey taught classes in criminology, criminal justice, juvenile delinquency, and deviant behavior. He had conducted a number of studies and published extensively in the areas of homicide and suicide.

5

Now, one thing here is a loss has been found to be associated with or precipitate or lead to suicide over and over and over. The more loss in someone's life, the more likely they are to become self-destructive. And it seems that killing a family member or killing a close friend is an act of self-destruction. They are, after all, killing something that is part of them, very close to them, very important to their self. They are destroying them. So in the act of killing another person they are in fact destroying part of [themselves, committing] a self-destructive act.

J.A. 684-85. Dr. Humphrey then described the types of losses to which he was referring--for example the loss of a parent or sibling. Further, Dr. Humphrey testified that he had interviewed Boyd and learned of the losses Boyd had experienced. Dr. Humphrey testified, "And what struck me [was] the consistency of Mr. Boyd's life with what we found to be true of homicide offenders in general." J.A. 687. Dr. Humphrey continued:

It seems that people who are threatened with loss, and mainly these are losses of someone very close to them, wife, girlfriend, some close relationship, at that point that they are threatened with this loss they become depressed, very commonly depressed, and depression is in a sense anger turned toward yourself. Now, at that point people react either toward themselves totally or they will react outwardly and inwardly at the same time. Those people who destroy someone or something at that point will not destroy a stranger, will not indiscriminately kill. They don't constitute a threat to the public. They constitute a threat to that which they fear losing the most, the person closest to them. And it is that person that is unfortunately in harm's way. And having extended that aggression toward other people they are in fact aggressing toward themselves. They are destroying that which they fear losing the most.

J.A. 688. Following voir dire, the State argued that Dr. Humphrey's testimony should not be admitted, asserting that the study was not "scientific" and that the testimony told the jury "[n]othing." J.A. 715. The trial court sustained the objection. The jury sentenced Boyd to

6

death, finding two aggravating factors--that the murder was especially heinous, atrocious, or cruel and that Boyd previously had been convicted of a felony of violence.

The North Carolina Supreme Court affirmed Boyd's conviction and sentence, holding that the exclusion of Dr. Humphrey's testimony was not error because the testimony was not mitigating. See State v. Boyd, 319 S.E.2d 189, 197-99 (N.C. 1984). The United States Supreme Court denied certiorari on April 15, 1985. See Boyd v. North Carolina, 471 U.S. 1030 (1985).

Thereafter, Boyd sought postconviction relief from his convictions and sentences in state court by filing a motion for appropriate relief (MAR). See N.C. Gen. Stat. § 15A-1415 (1997). The state court conducted an evidentiary hearing and denied relief. The North Carolina Supreme Court subsequently denied certiorari.

In February 1989, Boyd filed a § 2254 petition in the district court. This petition was held in abeyance pending a decision by the Supreme Court in McKoy v. North Carolina, 494 U.S. 433 (1990), and during Boyd's unsuccessful attempt to obtain postconviction relief under McKoy in state court. In October 1996, a magistrate judge recommended granting the State's motion for summary judgment as to all claims. The district court adopted the magistrate judge's recommendation and denied Boyd's application for a certificate of probable cause to appeal.

Boyd now seeks review in this court of the decision of the district court denying his petition for habeas corpus relief. [4] He raises five

_____

[4] Boyd's request for a certificate of probable cause to appeal is granted because at least one judge on the panel concludes that Boyd "has made a substantial showing of the denial of a constitutional right." 4th Cir. R. 22(a). There has been no argument concerning whether Boyd should be granted a certificate of probable cause to appeal, as he requested, or a certificate of appealability. And, we need not address that question here because the certificate would be granted based on the conclusion that Boyd made a substantial showing of the denial of a constitutional right irrespective of which type of certificate technically should be issued under these circumstances. Compare Lozada v. Deeds, 498 U.S. 430,

7

allegations of error: (1) that the sentencing court deprived him of his Eighth and Fourteenth Amendment rights to present mitigating evidence by refusing to permit Dr. Humphrey to testify; (2) that a reasonable likelihood exists that the instructions to the sentencing jurors concerning their consideration of mitigating evidence led the jurors to conclude that they could not consider a factor as mitigating unless the jurors unanimously concluded that the factor was mitigating in violation of the Eighth and Fourteenth Amendments; (3) that the prosecutor's closing argument in the sentencing phase was so inherently flawed that it deprived Boyd of a fair trial in violation of the Due Process Clause of the Fourteenth Amendment; (4) that the prosecution's knowing use of perjured testimony violated his Fourteenth Amendment right to due process; and (5) that the district court erred in concluding that Boyd's argument relating to the use of his state nolo contendere plea as a basis for a prior conviction was procedurally defaulted. We address these arguments in turn.

II.

Boyd first asserts that the state trial court deprived him of his rights under the Eighth and Fourteenth Amendments by refusing to permit his expert witness, Dr. Humphrey, to present mitigating evidence during sentencing. "`[T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, <u>as a mitigating factor</u>, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" <u>Eddings v. Oklahoma</u>, 455 U.S. 104,

_____

431-32 (1991) (per curiam) (explaining that to warrant the grant of a certificate of probable cause to appeal, a habeas petitioner must "make a substantial showing of the denial of [a] federal right" and that to satisfy this showing, the petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court <u>could</u> resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further" (alterations in original) (internal quotation marks omitted)), <u>with Murphy v. Netherland</u>, 116 F.3d 97, 101 (4th Cir.) (denying certificate of appealability under 28 U.S.C.A. § 2253 (West Supp. 1998) in habeas corpus action seeking relief from death sentence when petitioner failed to make a substantial showing of the denial of a constitutional right), <u>cert. denied</u>, 118 S. Ct. 26 (1997).

8

110 (1982) (second alteration in original) (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion)). Such evidence includes evidence of a defendant's troubled upbringing, see id. at 115, as well as evidence bearing on whether the defendant will pose a danger in the future, see Skipper v. South Carolina, 476 U.S. 1, 5 (1986). See also id. at 4 (noting "that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence" (internal quotation marks omitted)). The Due Process Clause of the Fourteenth Amendment may require the admission of mitigating evidence even if state-law rules of evidence (e.g. , hearsay) would exclude it. See Green v. Georgia, 442 U.S. 95, 97 (1979) (per curiam). Similarly, this court has observed that "the Supreme Court has been very sensitive to any impediment to the consideration of any type of mitigating evidence in a death sentencing hearing" and that "subject only to the loose evidentiary requirement of relevance, capital defendants have a right to offer any evidence they choose on character or record or circumstances of the offense." Hutchins v. Garrison, 724 F.2d 1425, 1437 (4th Cir. 1983) (internal quotation marks omitted); see Howard v. Moore, 131 F.3d 399, 418 (4th Cir. 1997) (en banc) (recognizing that the Eighth Amendment requires that all proffered relevant mitigating circumstances be presented to the sentencer for consideration in determining whether to impose a death sentence), petition for cert. filed, 66 U.S.L.W. ___ (U.S. May 22, 1998) (No. 97-9263); see also McKoy, 494 U.S. at 440 (explaining that "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a factfinder could reasonably deem to have mitigating value" (internal quotation marks omitted)). The question of whether an evidentiary ruling excluding testimony prevented the jury from considering mitigating evidence is a mixed question of law and fact that this court reviews de novo. See Howard, 131 F.3d at 418.

As discussed by the district court, Dr. Humphrey's proffered testimony addressed two distinct potentially mitigating factors. First, Dr. Humphrey explained that, based on his research, individuals in North Carolina who had committed a homicide of someone close to them had been subjected to more stressful life events in the form of losses and that based on his interview of Boyd, Boyd fit the profile of these individuals. Second, Dr. Humphrey opined that individuals who have suffered significant losses become depressed to the point that they act

9

in a self-destructive manner, which may include the destruction of that which they most fear losing.

The district court concluded that a portion of Dr. Humphrey's testimony was not mitigating, reasoning:

> Dr. Humphrey's opinion testimony that Petitioner Boyd, as a result of losses in his life, fit the profile of a man more likely to kill a friend than to kill a stranger is simply not mitigating. Standing alone, it is neutral on the question of future dangerousness, and it is also entirely without implication or inference that could affect a jury in forming a reasoned moral response to the question of whether Boyd should be given the death penalty.

J.A. 299 (internal quotation marks omitted). From this portion of Dr. Humphrey's testimony, Boyd argues, a reasonable juror could conclude that he would not pose a future danger because unlike some other first-degree murderers, he was not likely to kill at random and those circumstances under which he might be dangerous would be unlikely to reoccur in prison. Cf. Skipper, 476 U.S. at 5 (explaining that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating"). Additionally, he asserts that this portion of Dr. Humphrey's testimony provided the basis for a conclusion that Boyd fit within the category of offenders who act in a self-destructive manner in taking the life of someone close to them. Although we have serious questions concerning whether this portion of Dr. Humphrey's proffered testimony accurately may be characterized as mitigating,[5] we agree with the

_____

[5] The State contends that this evidence could not be mitigating evidence of Boyd's lack of future dangerousness because Dr. Humphrey never testified that Boyd was not homicidal or that he would not kill again. Rather, the State maintains that this portion of Dr. Humphrey's testimony could at most support a conclusion that Boyd was dangerous only to those who "established an intimate or family-type relationship with him." Brief of Appellees at 24. The evidence, the State asserts, is not mitigating and, on the contrary, is aggravating because it demonstrates that Boyd is precisely the dangerous killer of those close to him the State attempted to portray him as.

10

conclusion of the district court that the portion of Dr. Humphrey's testimony concerning the self-destructive motivation of those who have suffered great loss was mitigating because Boyd could have argued that he acted out of a self-destructive impulse rather than the selfish impulse advanced by the State.

While we conclude that the trial court committed constitutional error in excluding relevant mitigating evidence, the question remains whether that error was harmless. It is now well established that not all errors of constitutional dimension warrant a federal court to overturn a state conviction or sentence. See Chapman v. California, 386 U.S. 18, 23-24 (1967); Sherman v. Smith, 89 F.3d 1134, 1137 (4th Cir. 1996) (en banc), cert. denied, 117 S. Ct. 765 (1997); Smith v. Dixon, 14 F.3d 956, 974-75 (4th Cir. 1994) (en banc). Although federal habeas courts play an important role in protecting the constitutional rights of state criminal defendants, that role is circumscribed and secondary to that of state courts. See Brecht v. Abrahamson, 507 U.S. 619, 633 (1993). Once the principal avenue for review of a state criminal conviction and sentence--direct review--has been completed, "`a presumption of finality and legality attaches to the conviction and sentence.'" Id. (quoting Barefoot v. Estelle, 463 U.S. 880, 887 (1983)). Respect for the finality of a presumptively valid state-court conviction and sentence dictates that a federal court may not grant habeas corpus relief on the basis of trial error of constitutional dimension unless the court is convinced that "the error `had substantial and injurious effect or influence in determining the jury's verdict,'" id. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)), or at a minimum entertains grave doubt that it had such

_____

We need not address this argument because even if we were to agree with the State that this portion of Dr. Humphrey's testimony--that Boyd's history of personal loss typifies the profile of a killer who murders those who are emotionally closest to him when he fears losing them --is not mitigating with respect to Boyd's future dangerousness, the testimony nevertheless would have been admissible to provide the foundation for Dr. Humphrey's opinion that killers who have experienced this type of repeated personal loss may kill as a self-destructive act, which we determine is mitigating. Thus, for purposes of this opinion, we assume that both of these portions of Dr. Humphrey's testimony are mitigating.

11

an effect, see O'Neal v. McAninch, 513 U.S. 432, 437 (1995) (holding that when "the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the judge must resolve that doubt in favor of the habeas petitioner).**6**

In applying this standard, a federal habeas court does not ask whether the evidence of guilt was sufficient, whether the jury would have reached the same conclusion if the error had not occurred, or whether the jury reached the correct result based on the evidence presented. See Satcher v. Pruett, 126 F.3d 561, 567-68 (4th Cir.), cert. denied, 118 S. Ct. 595 (1997). Rather, the court reviews the record de novo to determine whether the error "substantially sway[ed] or substantially influence[d] the response" of the jury to the question put to it--i.e., in the guilt context, whether the defendant is guilty or not guilty and in the penalty context, whether the defendant should receive the death penalty. Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc), cert. denied, 118 S. Ct. 83 (1997); see O'Neal, 513 U.S. at 436 (explaining that in making the harmlessness determination, a federal habeas judge must review the record to assess whether "the judge[ ] think[s] that the error substantially influenced the jury's decision" (internal quotation marks omitted)); Brecht, 507 U.S. at 637 (holding that an error does not have a substantial and injurious effect on a jury verdict unless "it resulted in `actual prejudice'" to the habeas petitioner (quoting United States v. Lane, 474 U.S. 438, 449 (1986)).

Boyd contends that because neither his guilt nor the circumstances surrounding the murder were subject to serious dispute, his trial strategy was to show that the murder of his victim was the product of two factors--his significant impairment as a result of drug and alcohol consumption and his background of repeated losses of those closest to him. The State, in turn, attempted to portray Boyd as a cold, selfish

_____

**6** The Brecht Court left open the possibility that under unusual circumstances "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." Brecht, 507 U.S. at 638 n.9. This does not appear to be such a case.

man who, faced with imprisonment on an unrelated criminal charge, killed Hartman to prevent her from seeing other men.

We agree with the district court that the refusal of the state trial court to permit Dr. Humphrey to testify did not have a substantial or injurious effect on the determination of the jury that Boyd should be sentenced to death. Boyd's actions were indisputably premeditated. He had threatened Hartman in the weeks prior to the murder and had purchased a lock-blade knife just prior to his attack. Immediately before the murder, Boyd talked to Hartman calmly, assuring her that he would not hurt her. His sudden attack on Hartman was a brutal and hideous one in which he inflicted a total of 37 wounds while her family--including her young daughter--and friends watched in horrified helplessness. Hartman suffered a physically agonizing death. Furthermore, the underlying circumstances upon which Boyd was to argue that this was an act of self-destruction were before the jury. Boyd testified about the loss of his father and grandfather and about his love for Hartman.[7] We cannot conclude that, viewed in this context, any juror's sentencing decision would have been substantially influenced by hearing an expert criminologist opine that murderers who have experienced great personal losses are more likely to kill a family member or someone close to them than a stranger and are more likely to murder as an act of self-destruction and that Boyd's history of loss fit the pattern of someone in this category. Dr. Humphrey's testimony simply was not adequate to have had such an effect in the circumstances of this case. Thus, we hold that any error in refusing to permit Dr. Humphrey to testify does not provide a basis for federal habeas corpus relief.

III.

Boyd next challenges the instructions provided to the jury concerning the use of mitigating evidence. Jury instructions that require jurors to find unanimously the existence of a mitigating factor before that

_____

[7] We recognize that the testimony of Boyd and his mother may not substitute for Dr. Humphrey's expert testimony concerning these issues. However, we note that the state trial court did not compound the error by excluding the underlying mitigating factual evidence or prohibiting Boyd from arguing that the underlying facts were mitigating.

13

factor may be weighed in determining whether mitigating evidence outweighs aggravating factors are unconstitutional under the Eighth and Fourteenth Amendments. See McKoy, 494 U.S. at 439-44; Mills v. Maryland, 486 U.S. 367, 374-75 (1988). Although Boyd concedes that the trial judge did not give the jurors an explicit direction that they could not consider mitigating evidence unless they found its existence unanimously, he contends that read as a whole, there is a reasonable likelihood that the jury understood the instructions to have required such unanimity.

The instructions that Boyd challenges are identical to those recently held not to be violative of the Constitution in Noland v. French, 134 F.3d 208, 213-14 (4th Cir. 1998). We view our decision in Noland as dictating a conclusion that Boyd's challenge to the jury instructions lacks merit.

IV.

Boyd also maintains that the prosecutor's closing argument during the sentencing phase of his trial deprived him of due process. He contends that during the closing argument in the sentencing phase of the trial, the prosecutor made repeated references to his personal opinions concerning various matters, including Boyd's credibility; the credibility of Boyd's witnesses; the weight to be given various mitigating factors; certain biblical quotations and references; and the appropriateness of the death penalty for Boyd, including a reading of a North Carolina Supreme Court case suggesting that mercy was not appropriate in death cases, and referring to a later-repudiated system of mandatory capital punishment.

In determining whether a closing argument by a prosecutor violates due process, this court must look to "whether the proceeding at issue was rendered fundamentally unfair by the improper argument." Bennett v. Angelone, 92 F.3d 1336, 1345 (4th Cir.) (internal quotation marks omitted), cert. denied, 117 S. Ct. 503 (1996). This determination requires the court to look to "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." Id. at 1345-46 (internal quotation marks omitted).

14

Undoubtedly, all of the arguments of which Boyd complains were improper. A prosecutor should refrain from stating his personal opinions during argument and misleading the jury about the law. See Drake v. Kemp, 762 F.2d 1449, 1459-60 (11th Cir. 1985) (en banc). Furthermore, religiously based arguments are "universally condemned." Bennett, 92 F.3d at 1346. The remaining factors, however, weigh in favor of a conclusion that the prosecutor's argument did not deprive Boyd of a fair trial. The evidence that Boyd committed the offense was overwhelming. Further, the murder unquestionably was heinous, atrocious, or cruel, and Boyd had entered a stipulation that he had committed a prior felony of violence. In addition, although the improper remarks occurred intermittently throughout the prosecution's argument, some of the biblical references were invited by Boyd's testimony concerning his salvation experience while in prison awaiting trial and Boyd's explanation of the murder as having resulted from his being beguiled by Satan. Cf. United States v. Young, 470 U.S. 1, 12-13 (1985) (explaining that in determining whether prosecutor's improper argument was prejudicial to defendant, reviewing court must consider whether prosecutor's comments were invited response to defense and "did no more than respond substantially in order to right the scale" (internal quotation marks omitted)). Additionally, the state trial judge instructed the jurors that they were to decide the facts based on the evidence presented. Cf. Bennett, 92 F.3d at 1346-47 (concluding prosecutor's improper argument did not deny due process in part because trial court instructed jury: "What the lawyers say is not evidence. You heard the evidence. You decide what the evidence is." (internal quotation marks omitted)). Our review leads us to determine that the prosecutor's closing argument did not deprive Boyd of a fair trial.

V.

Boyd further asserts that his conviction resulted from the prosecution's knowing use of perjured testimony. A conviction acquired through the knowing use of perjured testimony by the prosecution violates due process. See Napue v. Illinois, 360 U.S. 264, 269 (1959). This is true regardless of whether the prosecution solicited testimony it knew to be false or simply allowed such testimony to pass uncorrected. See Giglio v. United States, 405 U.S. 150, 153 (1972); Napue, 360 U.S. at 269. And, knowingly false or misleading testimony by a

15

law enforcement officer is imputed to the prosecution. See Wedra v. Thomas, 671 F.2d 713, 717 n.1 (2d Cir. 1982); Curran v. Delaware, 259 F.2d 707, 712-13 (3d Cir. 1958) (citing Pyle v. Kansas, 317 U.S. 213 (1942)); cf. Boone v. Paderick, 541 F.2d 447, 450-51 (4th Cir. 1976) (recognizing that withholding of exculpatory evidence by police is imputed to the prosecution). But see Koch v. Puckett, 907 F.2d 524, 530-31 (5th Cir. 1990) (rejecting habeas petitioner's claim that sheriff and investigators testified falsely at trial on the basis that petitioner had failed to show that the prosecutor knew the testimony was perjurious). As this court has explained:

> The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant.

Barbee v. Warden, Md. Penitentiary, 331 F.2d 842, 846 (4th Cir. 1964) (footnote omitted). The knowing use of perjured testimony constitutes a due process violation when "`there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Kyles v. Whitley, 514 U.S. 419, 433 n.7 (1995) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)); see United States v. Ellis, 121 F.3d 908, 915 n.5 (4th Cir. 1997), cert. denied, 118 S. Ct. 738 (1998); United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994).

During Boyd's trial, each of the State's witnesses who testified regarding Boyd's condition either immediately before or just after the murder indicated that Boyd was not intoxicated. For example, the taxi driver who drove Boyd to the mall stated that Boyd did not appear to be intoxicated. The two salesmen in the store where Boyd purchased the knife immediately before the murder testified that Boyd did not appear to have been drinking or under the influence of anything. Hartman's father and a family friend both testified that they saw Boyd just prior to the murder and that he did not appear to be intoxicated. Following this evidence, the State presented the testimony of officers who observed Boyd just after the murder. Officer Sumner gave an

16

opinion that Boyd was not under the influence. Agent Perry stated his opinion that Boyd did not appear to be drunk or intoxicated. Detective Armstrong, the chief investigating officer, was asked by defense counsel, "[B]ased upon your observation of the defendant out there on the occasion you have described, in your opinion was he drunk or intoxicated?" J.A. 410. Detective Armstrong responded, "He didn't appear to me to be, no, sir." Id.

At the state MAR hearing, Boyd's attorney had the following colloquy with Detective Armstrong:

> Q. ... [T]hinking back on the day that you saw Mr. Boyd, do you have an opinion, yourself, on that date based on the limited time you had to observe him as to whether or not he was subject to some impairing substance at that time?
>
> A. I felt like he was at the time, yes.
>
> Q. What [made you think so?]
>
> A. Well, I had seen him sober. And I had seen him drunk on many occasions over the years.
>
> Q. What observation about him did you make that day that caused you to think he was subject to some impairing substance?
>
> A. I just felt like he was effected [sic] to some degree, that he was under the influence. I was a right good distance from him. But I've been at this same distance from him in the past when he was drinking. And just the way, the way he called my name and said that he was, what had we arrested him for, being under the influence.
>
> Q. To what extent do you think that he was impaired? Do you have a word that you can describe the extent of his impairment with?
>
> A. It would be appreciably.

17

Q. Appreciably means to you noticeably or clearly?

A. To me. It may have not been noticeable to someone else that didn't know him. But to me he had been, he was under the influence of something.

J.A. 883-84. When confronted during cross-examination by the State with the inconsistency of his testimony, Detective Armstrong admitted that he had not remembered his prior testimony. When asked by the State whether he told the truth when he testified at trial that Boyd was not intoxicated, Detective Armstrong answered affirmatively. And, Detective Armstrong agreed with the State that his trial testimony was closer to the murder, and he was a law enforcement officer at the time.

At the state MAR proceeding, Officer Perry was asked, "From the observations that you were able to make of [Boyd] that afternoon do you have an opinion as to whether he was under the influence of or intoxicated from any kind of drug or alcohol?" J.A. 914. He responded:

In my opinion he was not under the influence. He did appear to have either been drinking or maybe have taken some drugs. He was somewhat glassy-eyed. But he was walking, he was not swaying or staggering. He, in my opinion, was not under the influence of--to an appreciable degree.

Id.

The state MAR court determined that the State did not withhold exculpatory evidence from Boyd and that even if the evidence from the habeas hearing had been presented at trial it would not have affected the outcome of the proceedings. However, the state habeas court failed to render an express factual finding with respect to whether the officers knowingly presented misleading testimony. Because the state MAR court failed to make a factual finding on the question of whether the law enforcement officers knowingly presented false or misleading testimony, a federal evidentiary hearing to

18

resolve this issue normally would be required. See Townsend v. Sain, 372 U.S. 293, 312-13 (1963). Such a hearing is not necessary in this instance, however, because we conclude that there is no reasonable likelihood that the officers' testimony, if false, could have affected the judgment of the jury. The jury heard a wealth of testimony concerning the amount of alcohol and drugs that Boyd had ingested in the hours prior to the murder; undoubtedly the jury recognized that Boyd must have been impaired to some degree. However, the testimony of the lay witnesses and police officers established that despite the alcohol and drugs, Boyd's demeanor prior to and immediately after the murder was calm and controlled. As such, testimony by the officers that Boyd was under the influence would not have affected the verdict of the jury.

VI.

Finally, Boyd contends that the district court erred in holding federal habeas review of his argument concerning the use of his nolo contendere plea to establish a prior violent felony was barred because Boyd procedurally defaulted the claim. Absent cause and prejudice or a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489 U.S. 255, 262 (1989). Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

Boyd seeks to argue that his prior nolo contendere plea to a 1963 violent felony--assault with intent to commit rape--did not constitute a prior conviction for a felony involving the use of violence against the person of another within the meaning of N.C. Gen. Stat. § 15A-2000(e)(3) (1997). He contends that a conviction qualifies under § 15A-2000(e)(3) only if it was treated as a conviction under state law at the time and that North Carolina law prior to 1981 did not permit such treatment for pleas of nolo contendere.

Boyd recognizes that he did not raise this claim at trial--indeed, counsel stipulated that Boyd had a prior conviction within the mean-

19

ing of § 15A-2000(e)(3)--or on direct appeal. Further, the attorney who represented Boyd in his first state MAR proceeding failed to review personally trial counsel's files, in which the information concerning Boyd's prior conviction was contained, or to investigate the basis for the prior conviction. Because counsel did not discover the claim, it was not raised in Boyd's first MAR. However, attorneys for Boyd ultimately discovered this information and returned to state court to exhaust the claim. The state court that heard Boyd's second MAR found that "Boyd presented no evidence to show he was prevented by some objective factor external to the defense from raising the claim." J.A. 1036. Therefore, the state habeas court ruled that the claim was procedurally defaulted under N.C. Gen. Stat. § 15A-1419(a)(1) (1997). The North Carolina Supreme Court summarily denied Boyd's petition for certiorari. See Ylst v. Nunnemaker, 501 U.S. 797, 805-06 (1991) (holding that in applying procedural default provisions an unexplained appellate state-court decision is presumed to be based on the last reasoned decision).

Boyd acknowledges that the state court expressly relied on an independent state procedural ground to refuse to consider the merits of this claim, but argues that the state procedural rule is not "adequate" because it is not regularly or consistently applied. **8** This court has consistently held, however, that § 15A-1419 is an adequate and independent state-law ground for decision foreclosing federal habeas review. See Williams v. French, No. 97-19, 1998 WL 246105, at *3 (4th Cir. May 18, 1998); Ashe v. Styles, 39 F.3d 80, 87-88 (4th Cir. 1994) (explaining that a federal habeas petition should have been denied on the basis of procedural default because the state court denied relief pursuant to § 15A-1419(a) which is "an adequate and independent state law ground of decision"); see also O'Dell v. Netherland, 95 F.3d 1214, 1241 (4th Cir. 1996) (en banc) (holding that unambiguous procedural rules derived from state statutes or court rules are necessarily "firmly established" (internal quotation marks omitted)), aff'd, 117 S. Ct. 1969 (1997); Smith, 14 F.3d at 965-72 & n.10 (concluding that

_____

**8** Boyd also asserts that "cause" exists to excuse the default because the attorney who represented him during his first MAR was constitutionally ineffective in failing to raise this issue. This argument lacks merit. See Mackall v. Angelone, 131 F.3d 442, 446-49 (4th Cir. 1997) (en banc), cert. denied, 118 S. Ct. 907 (1998).

§ 15A-1419 is an adequate and independent state-law ground for decision).

VII.

In sum, we conclude that the refusal of the state trial court to permit Boyd to present the mitigating testimony of his expert witness, Dr. Humphrey, did not have a substantial or injurious effect on the verdict. Similarly, we are convinced that the verdict of the jury would not have changed if it had heard the police officers testify that Boyd was impaired on the day of the murder. And, Boyd's remaining arguments lack merit. Accordingly, we affirm the judgment of the district court.

AFFIRMED

MURNAGHAN, Circuit Judge, concurring:

I concur in the result the majority has reached but, with respect to Part II, I find necessary and sufficient only the initial paragraph and the conclusion that Dr. Humphrey's testimony was not erroneously excluded since it was not mitigating:

> [W]e have serious questions concerning whether this portion of Dr. Humphrey's proffered testimony accurately may be characterized as mitigating . . . we conclude that the refusal of the state trial court to permit Boyd to present the mitigating testimony of his expert witness, Dr. Humphrey, did not have a substantial or injurious effect on the verdict.

The proffered testimony of Dr. Humphrey was that "prisoners convicted of homicide had suffered over the course of their lives more stressful events than nonviolent offenders" and that "individuals whose victims were close to them tended to have experienced more loss in their lives than those who had killed strangers." Even if that proffered testimony was mitigating, it was harmless error to exclude it.

21