378 F.3d 382
UNITED STATES of America, Plaintiff-Appellant,v.James H. ROANE, Jr., Defendant-Appellee.United States of America, Plaintiff-Appellee,v.James H. Roane, Jr., Defendant-Appellant.United States of America, Plaintiff-Appellee,v.Cory Johnson, Defendant-Appellant.United States of America, Plaintiff-Appellee,v.Richard Tipton, Defendant-Appellant.
No. 03-13.
No. 03-25.
No. 03-26.
No. 03-27.
United States Court of Appeals, Fourth Circuit.
Argued: May 6, 2004.
Decided: August 9, 2004.

COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Appeal from the United States District Court for the Eastern District of Virginia, James R. Spencer, J.
Nos. 03-13 & 03-25. ARGUED: Robert John Erickson, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., for Appellant/Cross-Appellee. Paul Francis Enzinna, Baker Botts, Washington, D.C., for Appellee/Cross-Appellant. ON BRIEF: Paul J. McNulty, United States Attorney, Alexandria, Virginia; G. Wingate Grant, Assistant United States Attorney, Richmond, Virginia, for Appellant/Cross Appellee. Michael J. Barta, Jamie Kilberg, Cheryl Crumpton, Baker Botts, Washington, D.C., for Appellee/Cross-Appellant. No. 03-26. ARGUED: Barbara Lynn Hartung, Richmond, Virginia, for Appellant. Robert John Erickson, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., for Appellee. ON BRIEF: Edward E. Scher, Thorsen & Scher, L.L.P., Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia; G. Wingate Grant, Assistant United States Attorney, Richmond, Virginia, for Appellee. No. 03-27. ARGUED: Stephen Atherton Northup, Troutman Sanders, L.L.P., Richmond, Virginia, for Appellant. Robert John Erickson, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., for Appellee. ON BRIEF: ON BRIEF: Frederick R. Gerson, Robinson & Gerson, P.C., Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia; G. Wingate Grant, Assistant United States Attorney, Richmond, Virginia, for Appellee.
Before WILKINSON, KING, and DUNCAN, Circuit Judges.
Affirmed in part and reversed in part by published opinion. Judge KING wrote the opinion, in which Judge WILKINSON and Judge DUNCAN joined.
OPINION
KING, Circuit Judge:

1
In February 1993, James Roane, Cory Johnson, and Richard Tipton were convicted in the Eastern District of Virginia for an array of criminal activity, including several capital murders, arising out of drug-trafficking operations in and near Richmond. Each received at least one death sentence for his crimes, plus various terms of imprisonment. After unavailing direct appeals to this Court, United States v. Tipton, 90 F.3d 861 (4th Cir.1996), Roane, Johnson, and Tipton (the "Defendants") sought habeas corpus relief in the district court. The Government sought summary judgment on their claims, which the district court awarded, except for two claims raised by Roane. See United States v. Tipton, No. 3:92CR68 (E.D.Va. May 1, 2003) (the "Opinion"). After discovery proceedings and an evidentiary hearing on Roane's remaining two claims, the court granted relief on his Sixth Amendment claim of ineffective assistance of counsel ("IAC claim"), vacating Roane's convictions and sentences relating to the murder of Douglas Moody. See United States v. Roane, No. 3:92CR68 (E.D.Va. May 1, 2003) (the "Roane Opinion"). Finally, the court rejected Roane's claim of actual innocence of the Moody murder. Id.

2
We are now presented with four separate appeals, which we have consolidated. In Appeal No. 03-13, the Government appeals the district court's award of relief to Roane on his Sixth Amendment IAC claim. In No. 03-25, Roane cross-appeals the court's rulings in favor of the Government on certain of his other claims. And in Nos. 03-26 and 03-27, Johnson and Tipton appeal the award of summary judgment to the Government on certain of their claims. As explained below, we affirm the rulings in favor of the Government in Nos. 03-25, 03-26, and 03-27, and we reverse the award of relief to Roane in No. 03-13.

I.
A.

3
In our comprehensive 1996 opinion rejecting the Defendants' direct appeals, Judge Phillips aptly summarized the relevant facts underlying the prosecution of Johnson, Tipton, and Roane. See Tipton, 90 F.3d at 868-70. Because we are unable to improve on that summary, it is set forth in haec verba:

4
Recounted in summary form and in the light most favorable to the Government, the core evidence revealed the following. Tipton, Roane, and Cory Johnson were principal "partners" in a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. The conspiracy's operations began in Trenton, New Jersey where Johnson and Tipton, both from New York City, became members. In August of 1990, the conspiracy expanded its operations to Richmond, Virginia where Roane joined the conspiracy in November of 1991. The Trenton-based operation came to an end on June 4, 1991 when police confiscated a large quantity of crack cocaine and firearms. In late 1991, the conspiracy's operations were expanded from the Central Gardens area of Richmond to a second area in Richmond called Newtowne.

5
During the period of the conspiracy's operation, its "partners", including appellants, obtained wholesale quantities of powdered cocaine from suppliers in New York City, converted it by "cooking" [it] into crack cocaine, then packaged it, divided it among themselves, and distributed it through a network of 30-40 street level dealers, "workers." Typically, the appellants and their other partners in the conspiracy's operations took two-thirds of the proceeds realized from street-level sales of their product.

6
Over a short span of time in early 1992, Tipton, Cory Johnson, and Roane were variously implicated in the murders of ten persons within the Richmond area — all in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the "partners."

7
On January 4, 1992, Tipton and Roane drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. Once there, Roane grabbed Talley from the rear while Tipton stabbed him repeatedly. The attack lasted three to five minutes and involved the infliction of eighty-four stab wounds to Talley's head, neck, and upper body that killed him.

8
On the evening of January 13, 1992, Tipton and Roane went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, where Tipton shot Moody twice in the back. After Moody fled by jumping through a window, both Tipton and Roane pursued. Roane, armed with a military-style knife retrieved from an apartment where the knife was kept for co-conspirator Curtis Thorne, caught up with Moody in the front yard of the apartment where he stabbed him eighteen times, killing him.

9
On the night of January 14, 1992, Roane, Cory Johnson, and a third person retrieved a bag of guns that they had left at an apartment earlier that day. Roane then located Peyton Johnson, another rival drug dealer, at a tavern. Shortly after Roane left the tavern, Cory Johnson entered with another person and fatally shot Peyton Johnson with a semiautomatic weapon.

10
On January 29, 1992, Roane pulled his car around the corner of an alley, got out of the vehicle, approached Louis Johnson, whom appellant Johnson thought had threatened him while acting as bodyguard for a rival dealer, and shot him. Cory Johnson and co-conspirator Lance Thomas then got out of Roane's car and began firing at Louis Johnson. As Louis Johnson lay on the ground, either Cory Johnson or Thomas shot him twice at close range. Louis Johnson died from some or all of these gunshot wounds.

11
On the evening of February 1, 1992, Cory Johnson and Lance Thomas were told that Roane had gone to the apartment of Torrick Brown, with whom Roane had been having trouble. Johnson and Thomas armed themselves with semiautomatic weapons and went to the apartment where they joined appellant Roane outside. The three then knocked on Brown's door and asked his half-sister, Martha McCoy, if Brown was there. She summoned Brown to the door and Cory Johnson, Roane, and Thomas opened fire with semiautomatic weapons, killing Brown and critically wounding McCoy.

12
In late January, 1992, after being threatened by Cory Johnson for not paying for a supply of crack cocaine, Dorothy Armstrong went to live with her brother, Bobby Long. On February 1, Cory Johnson learned from Jerry Gaiters the location of Long's house. Thereafter, Tipton and an unidentified "young fellow" picked up Gaiters and Cory Johnson who were then driven by Tipton to a house where the group obtained a bag of guns. After dropping off the unidentified third party, the group proceeded to Long's house. Upon arriving at Long's house, Cory Johnson and Gaiters got out of the car and approached the house. While Tipton waited in the car, Cory Johnson and Gaiters went to the front door. When Long opened the door, Cory Johnson opened fire, killing both Dorothy Armstrong and one Anthony Carter. Bobby Long fled out the front door, but was fatally shot by Cory Johnson in the front yard.

13
In early February 1992, Cory Johnson began to suspect that Linwood Chiles was cooperating with the police. On February 19, 1992, Johnson borrowed Valerie Butler's automobile and arranged to meet with Chiles. That night, Chiles, Curtis Thorne, and sisters Priscilla and Gwen Greene met Cory Johnson and drove off together in Chiles's station wagon. Chiles parked the car in an alley, and Tipton soon drove in behind it in another car, got out, and came up alongside the stationwagon. With Tipton standing by, Cory Johnson told Chiles to place his head on the steering wheel and then shot Chiles twice at close range. Additional shots were fired, killing Thorne and critically wounding both of the Greene sisters. The autopsy report indicated that Thorne had been hit by bullets fired from two different directions.

14
Tipton was charged under 21 U.S.C. § 848(e) and 18 U.S.C. § 2 with capital murder for eight of these killings (Talley, Moody, Louis Johnson, Long, Carter, Armstrong, Thorne, and Chiles); Cory Johnson, with seven (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson); and Roane, with three, (Moody, Louis Johnson, and Peyton Johnson).

15
The jury convicted Tipton of six of the eight capital murders with which he was charged under § 848(e) (Talley, Armstrong, Long, Carter, Chiles, and Thorne). One of the other two § 848(e) charges was dismissed (Louis Johnson) and the other resulted in acquittal (Moody). Tipton was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a [continuing criminal enterprise ("CCE")] (21 U.S.C. § 848(a)), eight counts of committing acts of violence (the eight killings charged under § 848(e)) in the aid of racketeering activity (18 U.S.C. § 1959), two counts of using a firearm in relation to a crime of violence or a drug-trafficking crime (18 U.S.C. § 924(c)), and two counts of possessing cocaine base with intent to distribute (21 U.S.C. § 841(a)(1)).

16
The jury convicted Cory Johnson of all seven of the capital murders with which he was charged under § 848(e) (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson). He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), eleven counts of committing acts of violence (including the seven killings charged under § 848(e)) in aid of racketeering activity (18 U.S.C. § 1959), five counts of using a firearm in relation to a crime of violence or drug-trafficking offense (18 U.S.C. § 924(c)), and two counts of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

17
The jury convicted Roane of all three of the capital murders with which he was charged under § 848(e) (Moody, Peyton Johnson, and Louis Johnson.) He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), five counts of committing acts of violence (including the three killings charged under § 848(e)) in aid of racketeering activity (18 U.S.C. § 1959), four counts of using a firearm in relation to a crime of violence or a drug trafficking offense (18 U.S.C. § 924(c)), and one count of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

18
Following a penalty hearing on the capital murder counts, the jury recommended that Cory Johnson be sentenced to death on all of the seven § 848(e) murders of which he had been convicted; that Tipton be sentenced to death for three of the six § 848(e) murders of which he was convicted (Talley, Chiles, and Thorne); and that Roane be sentenced to death for one of the three of which he was convicted (Moody). The district court sentenced Johnson, Tipton, and Roane to death in accordance with the jury's recommendations pursuant to 21 U.S.C. § 848(l), and imposed various sentences of imprisonment upon each of the appellants for the several noncapital counts on which they were convicted and for those capital murder counts on which Tipton and Roane had been convicted but were not given death sentences.

19
On appellants' motion, the district court refused to order execution of the several death sentences on the grounds that Congress had neither directly authorized the means by which the death sentences imposed under § 848 should be carried out, nor properly delegated to the Attorney General the authority to issue the implementing regulations that were invoked by the Government. In consequence, the district court stayed execution of the death sentences it had imposed until such time as Congress had authorized the means of execution.

20

Id.

21
When the Defendants initially appealed their convictions and sentences to this Court, the Government cross-appealed the district court's stay of their death sentences. In our Tipton opinion, we analyzed and disposed of approximately sixty issues, including challenges by the Defendants to aspects of the jury-selection process, the trial's guilt phase, and the trial's penalty phase. See id. at 870-901. In rejecting nearly all these challenges, we affirmed the convictions and sentences of the Defendants, except for their convictions for violating 21 U.S.C. § 846 (conspiracy to commit drug offenses), which we vacated on double jeopardy grounds. Finally, on the Government's cross-appeal, we vacated the stay of their death sentences and remanded for the executions to proceed in accordance with regulations promulgated by the Attorney General. Id. at 901-03.

B.

22
Following our decision in Tipton, the Defendants persisted in seeking relief from their convictions and sentences. On May 8, 1998, they sought leave to interview jurors, pursuant to Local Rule 83.5 of the district court, which was denied. Johnson v. Pruett, No. 3:97CV895 (E.D. Va. June 10, 1998). On June 1, 1998, the Defendants sought relief under 28 U.S.C. § 2255, filing motions to vacate, set aside, or correct their sentences.1 The Government sought summary judgment on these motions, and the Defendants, in June 1999, requested leave to conduct discovery. The court granted the discovery request in part, authorizing Tipton to conduct certain forensic testing. Johnson v. Pruett, No. 3:97CV895 (E.D.Va. May 3, 2000).

23
In its Opinion disposing of the § 2255 motions, the district court awarded summary judgment to the Government except on Roane's claims that: (1) he was denied effective assistance of counsel in connection with the Moody murder, and (2) he was actually innocent of that murder. See Opinion at 114. The Defendants thereafter filed a joint motion to alter the Opinion, which the court denied. United Statesv. Tipton, No. 3:92CR68 (E.D.Va. July 15, 2003). Johnson and Tipton then moved for the issuance of certificates of appealability, which the district court awarded on November 26, 2003, as to all claims raised in their § 2255 motions. United States v. Tipton, No. 3:92CR68 (E.D.Va. Nov. 26, 2003). Johnson and Tipton have filed timely appeals, and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).

C.

24
On June 21, 2002, the district court conducted an evidentiary hearing on Roane's IAC claim and on his claim of actual innocence. In the Roane Opinion of May 1, 2003, the court made findings of fact regarding the representation rendered by Roane's trial attorney. See Roane Opinion at 2-8. In so doing, the court first addressed the evidence implicating Roane in the Moody murder, finding as follows:

25
• Denise Berkley testified that on the night of the Moody murder, she watched Roane stab Moody "18 or 19 times" while Moody pleaded for his life; that she then saw Sandra Reavis, Roane, Curt Thorne, Linwood Chiles, and Priscilla "Pepsi" Greene leave the scene of the murder in Chiles's station wagon; and that Roane took the knife he used to stab Moody and gave it to Pepsi Greene, asking her to get rid of it;

26
• Pepsi Greene testified that she heard two or three shots and then saw Roane and Tipton exit the house from which the shots were fired; that Roane then directed her to get him a knife; and that later that night, Roane returned the knife, then covered with blood, and told her to get rid of it; and

27
• Robert Davis testified that, immediately following the Moody murder, he saw Tipton and Roane by the steps near his house and heard them stating, "Yeah, I got him, I got him ... we can't stay out here, man. This is hot anyway."

28
Id. at 3-4. Importantly, the court found the testimony of these witnesses to be "credible and ... corroborated by the physical evidence of murder including the autopsy and the crime scene video." Id. at 4. Indeed, the court found Greene's testimony to be "particularly compelling." Id.

29
The court then focused on the evidence of Gina Taylor, who observed the Moody murder. Taylor had testified at trial that Roane was not involved. Id. The court found, however, that the value of Taylor's evidence was undermined by (1) her acknowledgment that she could not identify the assailant's gender and that she did not see his face, (2) the fact that she was evasive on cross-examination, and (3) her acknowledgment that she had "kind of" dated Tipton. Id.

30
The court then made findings regarding Roane's alibi for the Moody murder. According to the court, Roane had advised his lawyer prior to trial of the following: (1) he did not participate in the murder of Moody; (2) on January 12, 1992 — the night of the murder — he was in a Howard Johnson hotel room with codefendant Sandra Reavis; (3) he and Reavis were driven to the hotel by Linwood Chiles; (4) Carmella Cooley accompanied them to the hotel; and (5) Chiles had registered and paid cash for the hotel room. Id. at 5. The court found that the lawyer, David Baugh, "was convinced that Roane did not participate in the Moody murder" and that the hotel was a "couple of miles from where Douglas Moody was murdered." Id.

31
In addressing Mr. Baugh's pretrial investigation into Roane's alibi, the court found the following: (1) Mr. Baugh interviewed Cooley, who said that she had once accompanied Roane and Reavis to the Howard Johnson but could not verify the date; (2) Mr. Baugh concluded that Cooley's ignorance of the date and apparent hostility would make her a bad witness; (3) Mr. Baugh contacted the hotel seeking records of Linwood Chiles renting a room on January 12, 1992; (4) when the hotel manager advised that there were no such records, Mr. Baugh went to the hotel and personally sought to locate such records; (5) Mr. Baugh limited his search to the name "Linwood Chiles," and searched only for records of January 12, 1992; and (6) Mr. Baugh found no records of Linwood Chiles being registered at the hotel on January 12, 1992. Id.

32
The court analyzed the sufficiency of Mr. Baugh's pretrial investigation and concluded that it was constitutionally deficient. In so ruling, it found that: (1) an investigator hired by Roane's habeas corpus lawyer went to the Howard Johnson and looked through boxes of occupancy records for three hours; (2) the investigator found a card with the name "Chiles, Linwood" from the night of January 2, 1992, and a card with the name "Chiles, Larry" from the night of January 12, 1992; (3) in his trial preparation, Mr. Baugh could have subpoenaed the Howard Johnson records, or he could have devoted more effort to searching for them; (4) if Mr. Baugh had utilized the subpoena process or searched more diligently, he could have located the records found by the investigator; and (5) Roane was amenable to testifying in his own defense but was advised by Mr. Baugh not to testify unless his alibi defense could be objectively corroborated. Id. at 5-6.

33
Finally, the court made several findings on the evidence presented in the habeas corpus evidentiary hearing, to the following effect: (1) Roane's testimony was "tenable but not compelling"; (2) although Reavis confirmed Roane's alibi, her testimony was "flat and unpersuasive"; (3) because she would not waive her Fifth Amendment rights, Reavis would not have testified at trial; (4) Demetrius Rowe testified that, at about 8:30 p.m. on the night of the Moody murder, Reavis told Rowe that she was going to a hotel with Roane; (5) Rowe saw Reavis and Roane leave the area — not in Chiles's station wagon (as Roane claimed) but in a cab; (6) Rowe witnessed the murder of Moody and was sure Roane was not present; (7) Rowe did not provide anyone with this information before trial; and (8) to the extent it exculpated Roane, Rowe's evidence was "not credible" and "would carry no weight with a jury." Id. at 7.

34
Assessing all these findings in the context of the case, the court concluded that Mr. Baugh was constitutionally ineffective in his investigation of Roane's alibi. It therefore vacated Roane's convictions and sentences on the three counts related to the Moody murder, that is, Counts Five, Six, and Seven.2 Id. at 13. Finally, the court denied relief on Roane's claim of actual innocence.3 Id.

35
The Government appealed the court's ruling in favor of Roane on his IAC claim, and Roane sought a certificate of appealability on certain of the claims resolved against him, which the district court issued. United States v. Tipton, No. 3:92CR68 (E.D.Va. Nov. 26, 2003). Roane then cross-appealed, and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).

II.

36
In our consideration of the district court's rulings, we review its legal conclusions de novo and its findings of fact for clear error. Monroe v. Angelone, 323 F.3d 286, 299 (4th Cir.2003); see also Quesinberry v. Taylor, 162 F.3d 273, 276 (4th Cir.1998). We review de novo mixed questions of law and fact addressed by the district court — including the issue of whether a lawyer's performance was constitutionally adequate. Smith v. Angelone, 111 F.3d 1126, 1131 (4th Cir.1997). We review for abuse of discretion the district court's decision to deny a post-trial request to interview jurors, United States v. Gravely, 840 F.2d 1156, 1159 (4th Cir.1988), as well as its rulings on a discovery request. See Thomas v. Taylor, 170 F.3d 466, 474 (4th Cir.1999).

III.

37
The Defendants raise multiple issues on appeal, and the district judge has awarded a certificate of appealability on each of them.4 Under the applicable statute, an appeal may not be taken from a final order of a district court in a § 2255 proceeding unless a certificate of appealability has been issued. 28 U.S.C. § 2253(c)(1)(B). A certificate of appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right," id. § 2253(c)(2), and the judge must specify the issues on which the certificate has been granted, id. § 2253(c)(3). In this instance, the district judge issued certificates of appealability to the Defendants and explained, "[u]pon consideration of the Defendants' claims and the arguments offered in support thereof, the Court concludes that the issues for which the Defendants seek a certificate of appealability are adequate to deserve encouragement to proceed further." United States v. Tipton, No. 3:92CR68 (E.D.Va. Nov. 26, 2003).

38
Although some of the issues raised on appeal are common to the Defendants, certain issues pertain to only two of the Defendants or solely to a particular defendant.5 Each of their contentions, however, falls into one of six categories:

39
(1) claims that the prosecution unconstitutionally discriminated against women in the jury selection process;

40
(2) challenges to their § 848 CCE convictions — including claims that the trial court erred in failing to instruct and counsel were ineffective in failing to request an instruction that (a) the jury had to unanimously agree on which predicate violations constituted a "continuing series"; (b) the jury had to unanimously agree on the identities of the "five or more persons" that each Defendant supervised; and (c) certain categories of persons and certain types of relationships cannot constitute supervision;

41
(3) claims of prosecutorial misconduct during trial — including claims that (a) the prosecution knowingly introduced perjured testimony from witnesses Gregg Scott, Maurice Saunders, and Hussone Jones; and (b) the prosecution improperly withheld exculpatory evidence regarding witnesses "Wildman" Stevens, John Knight, and Stoodie Green;

42
(4) challenges to the court's conduct of the habeas corpus proceedings — including (a) challenges to the standard employed by the court in assessing the Defendants' discovery requests; (b) the contention that the court abused its discretion in granting summary judgment without allowing further discovery; and (c) Johnson and Tipton's claim that the court erroneously denied their motion for leave to interview jurors;

43
(5) IAC claims not otherwise addressed — including (a) that their lawyers should have further investigated their alleged gang activities in New York and New Jersey; (b) Johnson and Tipton's claim that their lawyers should have requested a voir dire inquiry on whether prospective jurors had a tendency to favor the death penalty; (c) Johnson and Tipton's claim that their lawyers failed to present mitigating evidence regarding prison conditions; (d) Tipton's claims that his lawyers failed to present adequate defenses to the Talley and Stoney Run murders;6 (e) Tipton's claim that his lawyers failed to present an adequate case-in-mitigation; (f) Roane's claim that his lawyers conceded certain aggravating factors; and (g) Roane's claim that his lawyers waived his right to attend the voir dire proceedings; and

44
(6) Johnson's Eighth Amendment claim that he is mentally retarded and cannot constitutionally be executed, and that his counsel were ineffective in failing to address this issue at sentencing and on direct appeal.7

We assess these various issues in turn.8
A.

45
At trial, the Government utilized two of its peremptory challenges to strike men from the jury panel, and it used eight peremptory challenges to strike prospective women jurors. The Defendants, however, failed to object at trial to the Government's use of its peremptory challenges. After trial, but before Defendants' direct appeal, the Supreme Court held that intentional gender discrimination by use of peremptory challenges contravenes the Equal Protection Clause. J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extending its holding in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) from racial discrimination to gender discrimination). The Defendants, in their direct appeal, raised the issue of sex discrimination in jury selection. In rejecting their claim, we explained that they had produced no evidence to support their claim, other than "raw figures" of men versus women stricken by the prosecution, and such raw figures were insufficient to make a prima facie showing of gender discrimination. Tipton, 90 F.3d at 881 & n. 11. Because we addressed this issue on direct appeal in Tipton, the Defendants cannot raise their J.E.B. claim again in these § 2255 proceedings.9

46
The Defendants also maintain that the failure of their counsel to object to the prosecution's use of its peremptory challenges constitutes ineffective assistance of counsel. At the time of their trial, however, the Supreme Court had not granted certiorari in J.E.B., and the Ninth Circuit was the only federal appellate court to extend the Batson principle to gender discrimination. See United States v. De Gross, 960 F.2d 1433, 1437-43 (9th Cir.1992) (en banc). Indeed, we had explicitly rejected attempts to extend Batson to gender. See United States v. Hamilton, 850 F.2d 1038, 1042 (4th Cir.1988) ("[W]e reject appellants' suggestion that the Equal Protection Clause compels us to extend Batson to apply to peremptory challenges exercised on the basis of gender."). In light of this precedent, the Defendants are unable to demonstrate that their counsel's failure to object to the prosecution's use of peremptory strikes against prospective female jurors fell below the range of professionally competent performance. See United States v. McNamara, 74 F.3d 514, 517 (4th Cir.1996) (explaining counsel not deficient for following controlling circuit precedent at time of trial). Accordingly, we must affirm the court's ruling on the IAC claims premised on the lack of an objection at trial to the prosecution's use of its peremptory strikes.

B.

47
We turn next to the Defendants' multiple claims of error regarding their convictions on the CCE counts. In order to convict a defendant of a CCE offense, the Government is required to prove five elements:

48
(1) [the] defendant committed a felony violation of the federal drug laws; (2) such violation was part of a continuing series of violations of the drug laws; (3) the series of violations were undertaken by defendant in concert with five or more persons; (4) defendant served as an organizer or supervisor, or in another management capacity with respect to those other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

49
United States v. Ricks, 882 F.2d 885, 890-91 (4th Cir.1989); see also 21 U.S.C. § 848(c). On appeal here, and in their § 2255 proceedings in district court, the Defendants focus on the second, third, and fourth of these elements.

1.

50
In their direct appeals, the Defendants asserted that the trial court had plainly erred in failing to instruct the jury that it was required to unanimously agree on three predicate violations supporting the "continuing series" element of § 848(c).10 Assuming that unanimity was required, we rejected this claim and explained that "the record plainly indicates that appellants could have suffered no actual prejudice from the lack of a special unanimity instruction on the predicate violation element" because "[b]y its verdict, it is clear that the jury unanimously found each guilty of at least five predicate violations...." Tipton, 90 F.3d at 885.

51
After we rendered our Tipton decision, the Supreme Court confirmed what we had assumed there. It held that, in a CCE prosecution, the jury must unanimously agree on the specific violations that make up the "continuing series." Richardson v. United States, 526 U.S. 813, 816, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). The Defendants now contend that the trial court's failure to give the Richardson instruction constitutes a structural defect in their trial and that they are therefore not required to show prejudice. In the alternative, they assert that they have demonstrated prejudice. Johnson and Tipton also maintain that their lawyers were ineffective in failing to object to the lack of a unanimity instruction. As explained below, we agree with the district court that these claims lack merit.

52
We have recognized that a trial court's failure to give a Richardson instruction is a procedural defect rather than a structural one. United States v. Stitt, 250 F.3d 878, 883 (4th Cir.2001) (rejecting assertion that Richardson error is structural defect); United States v. Brown, 202 F.3d 691, 699 (4th Cir.2000) (same). As explained in Stitt, a trial court's failure to give a Richardson instruction is subject to harmless error analysis, and a defendant raising such an issue must therefore demonstrate prejudice. Stitt, 250 F.3d at 883. We ruled on the Defendants' direct appeal that the trial court's failure to give a Richardson-type instruction did not prejudice them, see Tipton, 90 F.3d at 885, and we must therefore affirm the district court on this point.

53
In addition to their substantive Richardson claims, Johnson and Tipton maintain that their counsel's failure to request a Richardson-type instruction at trial constitutes ineffective assistance, in violation of the Sixth Amendment. Again, our decision on direct appeal forecloses this contention. In order to prevail on an IAC claim, a defendant must demonstrate that: (1) counsel's performance was deficient; and (2) such deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because we decided in Tipton that the Defendants were not prejudiced by the lack of a Richardson instruction, Johnson and Tipton are unable to satisfy the second prong of Strickland. Accordingly, we affirm the court's ruling on this claim as well.

2.

54
Relying on United States v. Jerome, 942 F.2d 1328, 1330-31 (9th Cir.1991), Johnson and Tipton next contend that they were entitled to a special unanimity instruction on the CCE charge regarding the identities of the "five or more persons" that each of them was alleged to have supervised. See 21 U.S.C. § 848(c). Not only has this claim been inexcusably defaulted by Johnson and Tipton's failure to raise it either at trial or on direct appeal, it also fails because, in Stitt, we held that Richardson did not change the rule "that the jury need not unanimously agree on which five persons were organized, supervised, or managed by the defendant." Stitt, 250 F.3d at 886.

55
Johnson and Tipton nevertheless claim that their attorneys were constitutionally ineffective in failing to raise this unanimity issue at trial. Because Stitt stands for the proposition that unanimous agreement on the identity of each supervisee is not required, we agree with the district court that the lawyers were not ineffective in failing to seek such an instruction. See Opinion at 21-25.

3.

56
Johnson and Tipton next contend that the trial court erred in failing to instruct — and counsel were ineffective in failing to request — that certain categories of persons (i.e., drug kingpins) cannot as a matter of law be supervisees, and that certain types of relationships (i.e., buyer-seller) cannot constitute supervision. See United States v. Barona, 56 F.3d 1087, 1096-97 (9th Cir.1995) (finding error in failing to instruct that certain individuals who were on list of potential supervisees given to jury were incapable, as a legal matter, of counting as supervisees). This claim has been defaulted by the failure of Johnson and Tipton to raise it either at trial or on direct appeal. See Bousley v. United States, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). Like the district court, see Opinion at 19, 21-25, however, we will briefly examine this claim in order to assess the contention that counsel's failure to raise it in a timely manner resulted from constitutionally ineffective representation.

57
The trial court gave the following instruction regarding the supervision element of § 848(c):

58
[t]he term "organizer" and the term "supervisory position" and "position of management" are to be given their usual and ordinary meanings. These words imply the exercise of power or authority by a person who occupies some position of management or supervision.

59
See Opinion at 19-20. We upheld this very instruction in United States v. Hall, 93 F.3d 126, 130 (4th Cir.1996), two months after our decision in Tipton. In Hall, the defendant maintained that the jury should have been instructed that he could have neither supervised nor organized individuals with whom he had only a buyer-seller relationship. Id. As we explained in Hall, [j]urors are competent to understand and apply ordinary concepts like organizer, supervisor and management." Id. at 131. This jury, like the one in Hall, was fully capable of understanding the term "supervision." Accordingly, Johnson and Tipton were not prejudiced by the lack of such an instruction, and their counsel were not ineffective in failing to request a more detailed instruction regarding these terms.11

C.

60
We turn next to the contentions of Johnson and Tipton that their trial was prejudiced by multiple instances of prosecutorial misconduct. They contend that the prosecution knowingly introduced false testimony at trial, in contravention of their due process rights, from witnesses Gregg Scott, Maurice Saunders, and Hussone Jones. And Tipton asserts that the Government contravened the principles of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding from them exculpatory evidence pertaining to the witnesses "Wildman" Stevens, John Knight, and Stoodie Greene. We assess these claims in turn.

1.

61
First, Johnson and Tipton contend that the prosecution knowingly introduced perjured testimony from Gregg Scott, Maurice Saunders, and Hussone Jones. In order to prevail on such a claim, Johnson and Tipton are required to demonstrate that: (1) the testimony was false, see Boyd v. French, 147 F.3d 319, 329-30 (4th Cir.1998); (2) the Government knew the testimony was false, see Thompson v. Garrison, 516 F.2d 986, 988 (4th Cir.1975); and (3) there is a reasonable probability that the false testimony could have affected the verdict, Boyd, 147 F.3d at 330. As explained below, we agree with the district court that this claim must be rejected.

62
a.

63
In support of this habeas corpus claim, Johnson and Tipton submitted affidavits from various gang members in New York, asserting that Gregg Scott had lied at trial when he: (1) testified that the New York Boyz (a gang of which Johnson and Tipton were allegedly members) met to discuss retaliating against individuals who threatened other members of the gang; and (2) testified that he received guns from a man known as "Light."12 Although Johnson and Tipton raised a factual issue on the falsity of these statements, they offered no proof that the Government knew or should have known this testimony to be false. Opinion at 33-35. And the fact that the evidence may have benefitted the Government is not enough. Such "`[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice' to stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing, because none of these would be admissible evidence at an evidentiary hearing." Id. at 35 (quoting United States v. Aiello, 814 F.2d 109, 113 (2d Cir.1987)). We therefore affirm the district court's ruling on this claim.

64
b.

65
Johnson and Tipton next assert that the Government knew, or that it should have known, that Maurice Saunders testified falsely at trial when he claimed that he saw Light during two trips to New York, and that Light could not have been in New York because he was in fact incarcerated elsewhere during Saunders's visits. Again, Johnson and Tipton proffer no evidence that the Government, at the time of trial, knew or should have known of Light's incarceration. See Horton v. United States, 983 F.Supp. 650, 654-55 (E.D.Va.1997) (rejecting assertion that, for Brady purposes, federal prosecutor is charged with knowledge of state prison records). And conclusory accusations that the Government should have known that a statement was false, without more, do not warrant an evidentiary hearing or offer escape from summary judgment. See Aiello, 814 F.2d at 113-14.

66
In any event, Johnson and Tipton have made no showing that such testimony about Light's incarceration, even if untrue, could have affected the outcome of their trial. As the district court explained in denying their IAC claim regarding the prosecution's failure to discover Light's incarceration, the Government presented extensive trial evidence of Johnson and Tipton's New York connections and gang-related activities. Opinion at 39 (explaining that the proffered testimony of Light's incarceration does not negate the following: "Anthony Howlen's testimony that Johnson and Tipton were part of the New York Boyz and sliced him with razors when he interfered with their attempts to sell drugs in New Jersey; the repeated references to the New York Boyz during the course of the Richmond based activities; Tipton's threats to invoke the assistance of his New York associates if retaliatory actions were required; the appearance of New York Boyz Lance Thomas and Hess in Richmond; and the repeated trips by Tipton and Johnson from Richmond to New York to obtain drugs"). We therefore affirm the district court on this claim.

67
c.

68
Johnson and Tipton also contend that the witness Hussone Jones lied when he testified about the murder of Douglas Talley. Jones testified at trial that he watched from his own car as Tipton stabbed Talley in Talley's car. Johnson and Tipton assume that this testimony was false because there were no street lights in the area of the crime, and they contend it was too dark for Jones to see anything. The district court found, however, that Jones was within ten to twenty feet of Talley's car, and that the car was illuminated by its dome light. The dome light was lit because, after initially being stabbed, Talley's arms and head prevented the car door from closing. Opinion at 54-55. Jones's testimony was consistent with the facts observed at the crime scene, and Johnson and Tipton have failed to make the requisite showing of falsity.

2.

69
Tipton also asserts that the prosecution improperly withheld exculpatory evidence from his counsel, in violation of due process and Brady, regarding the witnesses "Wildman" Stevens, John Knight, and Stoodie Green. In order to establish a Brady violation, Tipton was required to demonstrate that the information at issue was "favorable to the accused"; that it was "suppressed by the [Government], either willfully or inadvertently"; and that prejudice to the defense ensued. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The district court held that Tipton failed to establish a Brady violation, see Opinion at 57, 63-64, and we agree.

70
Tipton contends, first of all, that the prosecutors knew, and yet failed to disclose, that the witness Stevens had denied receiving a knife from Tipton, and that this information would have refuted Jones's testimony that Tipton gave Stevens a bloody knife on the night of the Talley murder. As for this claim, the district court found that there was no evidence that Stevens actually conveyed this information to the prosecution. Id. at 57. Accordingly, this contention fails under the second Brady prong.

71
Second, Tipton asserts that the prosecutors knew of, and yet also failed to disclose, statements by the witnesses John Knight and Stoodie Green providing Tipton an alibi on the night of the Stoney Run murders. Tipton's Brady claims must fail, however, because, "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine." United States v. Wilson, 901 F.2d 378, 381 (4th Cir.1990). We have explained that information actually known by the defendant falls outside the ambit of the Brady rule. Fullwood v. Lee, 290 F.3d 663, 686 (4th Cir.2002). Obviously, Tipton knew who he was with on the evening of the Talley murder — he had no need for the Government to provide him with such information. Thus, no Brady violation has been shown, and we affirm the district court's ruling on the issue.

D.

72
We turn next to the Defendants' multiple challenges to the district court's conduct of their habeas corpus proceedings. These contentions include (1) their challenge to the standard utilized by the court in assessing their discovery requests; (2) their contention that the court abused its discretion in awarding summary judgment to the Government without first according them an opportunity to conduct discovery; and (3) their assertion that the denial of their motion for leave to interview jurors was erroneous.

1.

73
Other than authorizing Tipton to conduct forensic testing of a knife found at the Talley murder scene, the court denied the Defendants' broad motions for authority to conduct discovery in their habeas corpus proceedings. Johnson v. Pruett, No. 3:97CV895 (E.D.Va. May 3, 2000). Pursuant to Rule 6(a) of the Rules Governing § 2255 Proceedings, a prisoner may engage in discovery only "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants him leave to do so, but not otherwise." The Defendants contend that the district court utilized an incorrect legal standard in assessing their discovery requests. And the Defendants assert that, regardless of the standard employed, such discovery should have been authorized. We are constrained to disagree.

74
In denying the request for discovery, the court explained the standard it was utilizing:

75
The Supreme Court determined in Harris v. Nelson, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), and its progeny, Bracy v. Gramley, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997), that `good cause' for discovery exists when a petition for habeas corpus establishes a prima facie case for relief. See Harris v. Nelson, 394 U.S. at 290, 89 S.Ct. 1082. Specifically, discovery is warranted, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." Bracy, 520 U.S. at 908-09, 117 S.Ct. 1793 (citing Harris, 394 U.S. at 299-300, 89 S.Ct. 1082).

76
Johnson v. Pruett, No. 3:97CV895 (E.D.Va. May 3, 2000). The Defendants assert that the court, in ruling against them, improperly applied a stringent "prima facie" standard under Harris, instead of a more forgiving "good cause" standard authorized by Bracy. This contention is incorrect. In Bracy, the Court cited with approval the discovery standard articulated in Harris, merely clarifying the definition of "good cause." See Quesinberry v. Taylor, 162 F.3d 273, 279 (4th Cir.1998) (observing that Bracy approved the Harris standard); see also Murphy v. Johnson, 205 F.3d 809, 813 (5th Cir.2000) ("[T]he Bracy decision does not lower the grade for discovery in habeas cases, but rather it merely reasserts the standards of Harris v. Nelson...."). Here, the district court properly applied the good cause standard outlined in Harris and Bracy, and it did not abuse its discretion in deciding that the Defendants had not shown good cause for the bulk of their discovery requests. The court carefully considered each claim asserted by the Defendants, and it assessed whether the Defendants had shown good cause for discovery. See Johnson v. Pruett, No. 3:97CV895, at 3-12 (E.D.Va. May 3, 2000). Because the court applied the proper standard and did not abuse its discretion, we affirm its rulings on this issue.13

2.

77
Johnson and Tipton next contend that the district court abused its discretion in denying their claims of juror misconduct without first granting them leave to interview the jurors. According to Johnson and Tipton, the jurors were exposed to extraneous information during trial, including extensive media coverage, which clouded their judgment.

78
We have already assessed and disposed of at least one aspect of this claim. During trial, two jurors admitted reading an inflammatory article about the Defendants. One of those jurors was excused by the trial court, but the other, Mr. Cooke, advised the court that the article would not affect his consideration of the case, and he continued to serve. On direct appeal, the Defendants contended that Cooke should have been removed from the jury because he had been exposed to mid-trial adverse publicity. We specifically considered this claim and found no error in the court's decision with regard to Cooke. Tipton, 90 F.3d at 891 n. 16. In addition, we agree with the district court that Johnson and Tipton's remaining media-related claims with respect to the jury have been procedurally defaulted by their failure to raise them either at trial or on direct appeal. See Opinion at 3.

79
As to their non-media-related juror misconduct claims, the district court carefully explained that they are so speculative as to be "insufficient to survive summary dismissal, much less summary judgment." United States v. Tipton, No. 3:92CR68, at 3 (E.D.Va. July 15, 2003). Throughout the trial, the court gave cautionary instructions to the jury concerning both media coverage and other possible outside influences, repeatedly reminding the jurors to avoid such external sources of information. Johnson and Tipton have provided us with nothing to suggest that the jurors violated these instructions. And as we observed in Gravely,"[r]equests to impeach jury verdicts by post-trial contact with jurors are disfavored." 840 F.2d at 1159. Before proceeding down the path of impeaching a jury verdict, a § 2255 movant must make a threshold showing of improper outside influence. Id. In this instance, the court did not abuse its discretion in finding that no such showing had been made. Id. (explaining that denial of jury investigation is subject to abuse of discretion review). Put simply, Johnson and Tipton have failed to proffer any evidence that the jurors engaged in misconduct or that they were improperly exposed to outside influences. We therefore affirm the court's rulings on the Defendants' request to interview the jurors. See Opinion at 3; United States v. Tip-ton, No. 3:92CR68, at 3 (E.D.Va. July 15, 2003).

E.

80
The Defendants also assert multiple other IAC claims, contending that: (1) their lawyers should have further investigated their alleged gang activities in New York and New Jersey; (2) Johnson's and Tipton's lawyers should have requested a "reverseWitherspoon" inquiry;14 (3) Johnson's and Tipton's lawyers failed to present mitigating evidence regarding prison conditions; (4) Tipton's lawyers failed to present adequate defenses to the Talley and Stoney Run murders; (5) Tipton's lawyers failed to make an adequate case-in-mitigation; (6) Roane's lawyers conceded certain aggravating factors; and (7) Roane's lawyers waived his right to voir dire.

81
As we have explained, the Court in Strickland established that an IAC claim has two prongs: (1) that counsel's performance was deficient; and (2) that such deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. 2052. A defendant asserting an IAC claim must therefore satisfy both prongs, and a failure of proof on either prong ends the matter. See Williams v. Kelly, 816 F.2d 939, 946-47 (4th Cir.1987).

82
Under the first prong of Strickland, we apply a "strong presumption" that a trial counsel's strategy and tactics fall "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. For a lawyer's trial performance to be deficient, his errors must have been so serious that he was not "functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 104 S.Ct. 2052. And the reasonableness of a lawyer's trial performance must be "evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of reasonableness is highly deferential." Kimmelman v. Morrison, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); see also Strickland, 466 U.S. at 689, 104 S.Ct. 2052.

83
In order to establish prejudice under Strickland's second prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. As explained below, we agree with the district court that the Defendants' remaining IAC claims lack merit, standing alone or viewed in the aggregate.

1.

84
First of all, the Defendants maintain that their lawyers should have further investigated their alleged gang activities in New York and New Jersey, and that this failure constitutes constitutionally ineffective assistance. They assert that such an investigation would have led to the discovery of impeaching evidence on certain prosecution witnesses — i.e., that Light was in jail when Saunders supposedly saw him in New York, and that Scott's testimony about gang-related retaliation was false.

85
Notwithstanding whether counsel's investigation was reasonable, the Defendants have failed to establish prejudice under Strickland's second prong. As the district court explained, substantial negative repercussions would have resulted to the Defendants from the introduction at trial of such impeachment evidence. Opinion at 38. Many of the purported impeaching witnesses had acknowledged being involved in illegal drug transactions with Johnson and Tipton and in pooling their money with Johnson and Tipton to purchase drugs, and Light did not deny that he was a regular source of Tipton's for crack cocaine. Id. In addition, none of this evidence would have undermined the overwhelming evidence before the jury that the Defendants were involved in a CCE in the Richmond area, and that their enterprise had distributed illegal drugs and killed on several occasions in order to ensure its success. Accordingly, the Defendants could not have been prejudiced by any purported omissions of their counsel in this regard, and these claims must be rejected.

2.

86
Johnson and Tipton next contend that, under the principle established in Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), their counsel were constitutionally ineffective in failing to request a specific "reverse-Witherspoon" inquiry of all prospective jurors. Under Morgan, a capital defendant has the right to an "inquiry sufficient to ensure — within the limits of reason and practicality — a jury none of whose members would `unwaveringly impose death after a finding of guilt' and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law." Tipton, 90 F.3d at 878 (quoting Morgan, 504 U.S. at 733, 112 S.Ct. 2222). Johnson and Tipton contend that their lawyers failed to ensure that each prospective trial juror was specifically asked whether he or she would always impose a sentence of death. On direct appeal, however, this Court foreclosed the prejudice prong of this contention when, in considering a separate contention concerning voir dire, we concluded that "the district court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would always vote for the death penalty." Id. at 879. Accordingly, Johnson and Tipton are unable to satisfy Strickland's second prong, and their counsel were not constitutionally ineffective for failing to request a reverse-Witherspoon inquiry.

3.

87
Johnson and Tipton next contend that their lawyers were constitutionally ineffective for failing to present mitigating evidence regarding the prison conditions they would face if sentenced to life imprisonment without the possibility of parole. This contention is made in response to a point argued by the prosecutor during closing: "Ask yourself, should they be punished beyond incarceration? I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of their existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones." Essentially, Johnson and Tipton contend that, had their lawyers explained to the jury that actual prison conditions were more difficult than this benign description would suggest, the jury may have seen a life sentence as sufficient punishment and rejected the death penalty.

88
As the district court correctly explained, if the lawyers had introduced evidence of prison conditions, the prosecution would simply have been afforded another opportunity to remind the jurors that Johnson and Tipton possessed a "proven inclination to engineer murders from behind prison walls." Opinion at 77. And the Government could have drawn the stark contrast between prison life and the living conditions of the incapacitated Greene sisters who were critically wounded during the Stoney Run murders. Accordingly, the lawyers acted reasonably in deciding not to describe prison conditions as mitigating evidence.

4.

89
Tipton next asserts that his counsel were ineffective in their defense of him on the Talley murder counts (Counts Three and Four), and on the Stoney Run murder counts (Counts Twenty-four and Twenty-five). We reject both of these contentions.

90
a.

91
Tipton maintains that, based on pathologist Dr. Fierro's testimony, Tipton, who is right-handed, could not have been Talley's murderer. Accordingly, Tipton contends that Hussone Jones's eyewitness testimony must have been false and that his counsel were ineffective in failing to exploit this fact. We disagree. The district court expressly found that "Dr. Fierro's testimony did not suggest that Tipton, who was initially sitting on the right of Talley, could not stab Talley on the right side of his body.... Such a diffusion of wounds is consistent with Jones' description...." Opinion at 55. In light of this factual finding, counsel were not deficient in failing to urge the jury to absolve Tipton on the basis of Dr. Fierro's testimony.

92
Tipton also contends that defense counsel were ineffective in failing to interview and call as a witness "Wildman" Stevens, who, according to an affidavit submitted during the § 2255 proceedings, would have contradicted Jones's testimony that Jones drove Tipton and Roane to Stevens's house immediately after Talley's murder. As the district court found, however, there was no evidence that Tipton had advised his counsel that Stevens could contradict Jones's description. Id. at 58; see Lackey v. Johnson, 116 F.3d 149, 152 (5th Cir. 1997) (explaining lawyer not ineffective for failing to discover evidence that client knew but withheld). And as the court explained, Tipton's counsel had no reason to believe that it would be fruitful to interview Stevens, considering the fact that the evidence indicated that Stevens was simply another member of the CCE. Opinion at 58. Accordingly, we affirm the court's determination that counsel were not ineffective in defending Tipton on the Talley murder counts.

93
b.

94
Tipton also contends that his counsel failed to mount an adequate defense to the Stoney Run murder counts. In particular, Tipton contends that counsel should have called John Knight and Stoodie Green as alibi witnesses. Again, we agree with the district court's denial of this IAC claim. As the court explained, "[c]onspicuously absent from the record is any evidence from Tipton that he told counsel that Stoodie Green or Knight could exonerate him from involvement in the Stoney Run murders." Opinion at 64. We agree with the court that Tipton's counsel was not constitutionally ineffective in his defense of the Stoney Run murders.

5.

95
Tipton claims that his attorney failed to present an adequate case-in-mitigation at the penalty phase of his trial. In particular, Tipton relies on the absence of evidence from his mother, his paternal grand-mother, and an older woman in whose home he resided in early 1992 — specifically contending that these witnesses could have testified to Tipton's unfortunate childhood. Again, we agree with the district court that "[t]he record refutes such a claim," in that counsel presented extensive evidence through both lay and expert witnesses, and succeeded in convincing the jurors to find twelve mitigating factors, a number of which pertained to Tipton's difficult childhood and his mental deficiencies. Opinion at 77-80. Indeed, the mitigating evidence in the trial's penalty phase was sufficiently compelling to convince the jury to return non-death verdicts on three of the six capital counts against Tipton, despite the existence of numerous and weighty aggravating factors. In light of the compelling mitigation case presented by Tipton's counsel in the trial's penalty phase, the court correctly concluded that their performance was not constitutionally deficient and that Tipton was not prejudiced by the absence of additional witnesses.

6.

96
Roane maintains that his trial counsel rendered ineffective assistance at the trial's penalty phase in failing to contest — and indeed, in effectively conceding — the sufficiency of the Government's proof of the aggravating factor that the murder of Moody involved substantial planning and premeditation. According to Roane, this concession was error because there was no evidence that he manifested a premeditated intent to kill Moody or that there was substantial planning, or any planning at all. The district court disagreed, and we agree with the district court. The court found that the evidence of substantial planning and premeditation was ample and that, in light of that evidence, "[t]he best hope for Roane was to emphasize the evidence in mitigation rather than challenge the prosecution's solid case on the substantial planning aggravating factor." Opinion at 71; see Carter v. Johnson, 131 F.3d 452, 466 (5th Cir.1997) (concluding that it was reasonable for counsel to concede client's culpability in order to establish credibility with jury); Bell v. Evatt, 72 F.3d 421, 429 (4th Cir.1995) (concluding counsel reasonably conceded defendant's guilt of kidnapping to retain credibility for penalty phase). Because the performance of Roane's counsel was not constitutionally deficient, we affirm the district court.

7.

97
Relying on Near v. Cunningham, 313 F.2d 929, 931 (4th Cir.1963), Roane maintains that a capital defendant may not waive his presence at trial and that his trial attorney was necessarily deficient when, after consulting with Roane, he waived Roane's right to be present during portions of the jury selection process. Roane contends that he was prejudiced as a result because, had he been present throughout voir dire, he would have insisted on using peremptory strikes to remove three jurors who ultimately served on the jury. He maintains that, had those strikes been utilized, the outcome of the trial's penalty phase would likely have been different.

98
Again, our decision on direct review forecloses this contention. In applying plain error review to Roane's waiver-of-presence claim, we observed that Roane did not offer anything to suggest that he was prejudiced by his intermittent absences from jury voir dire beyond the conclusory assertion that he was presumptively prejudiced. Tipton, 90 F.3d at 875-76. Accordingly, Roane is unable to satisfy the second prong of Strickland, and we need not consider this issue further.

F.

99
Johnson maintains that he is mentally retarded and that, under federal law, he cannot be executed. He further contends that his counsel were ineffective for failing to argue this point during sentencing. The district court rejected these contentions, see Opinion at 80-84, and we agree.

1.

100
Under federal law, "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 21 U.S.C. § 848(l); see also Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that execution of mentally retarded defendant constitutes cruel and unusual punishment under Eighth Amendment). The district court found, based on data of the American Association on Retardation, that an IQ of 75 or below places a person in the retarded category. Id. at 80. At the penalty phase of Johnson's trial, Dr. Dewey Cornell, a psychologist, testified that, on October 10, 1992, he had administered a Wechsler Adult Intelligence Scale Test ("WAIS Test"). Johnson exhibited an IQ of 77, which indicated a "generally impaired intelligence," placing him "just above the level of mental retardation." Importantly, Dr. Cornell testified that he knew the significance of finding Johnson's IQ to be above 75 (i.e., this finding would render Johnson death-eligible), and that he double-checked his numbers and consulted colleagues before reaching this conclusion.

101
Despite Dr. Cornell's evidence, Johnson asserts that he is in fact mentally retarded. In support of this proposition, Johnson points to evidence offered during the penalty phase that his IQ was somewhere between 69 and 74 in 1985, and he relies on a 1996 publication concluding that the WAIS test tends to inflate IQ scores over the years:

102
Individuals appear to gain 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

103
Id. at 81 (quoting The Psychological Corporation, An Introduction to the Wechsler Adult Intelligence Scale, (3d ed.1996)). Based on these authorities, Johnson maintains that his actual IQ is below 75 and that his score of 77 is a product of score inflation. As the district court explained, however, Dr. Cornell's evidence that he double-checked his findings and consulted with colleagues before concluding that Johnson was not mentally retarded "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." Id. at 81-82. Accordingly, Johnson is not barred from execution due to mental retardation.

2.

104
Johnson next contends that his counsel was ineffective for failing to assert possible IQ-score inflation at sentencing. We agree with the district court that Johnson's trial attorney was not ineffective for failing to raise this issue. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. And "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. In this instance, Johnson's lawyer was presented with a mental health report, and he was under no mandate to second-guess that report. See Wilson v. Greene, 155 F.3d 396, 403 (4th Cir.1998) (rejecting inmate's claim that counsel should have pursued mental health defenses where psychological report indicated inmate was competent to stand trial). In these circumstances, Johnson's counsel was not constitutionally ineffective in this respect.

IV.

105
Finally, we turn to the Government's appeal in No. 03-13, challenging the district court's ruling that Roane's counsel, David Baugh, was constitutionally ineffective for failing to properly investigate Roane's alibi defense for the Moody murder. See Roane Opinion at 2-11. The court found that Mr. Baugh's investigation into Roane's potential alibi failed both prongs of Strickland, i.e., (1) his performance was deficient, and (2) his deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Because the district court erred in concluding that Mr. Baugh's representation of Roane was deficient under the first prong of Strickland, we reverse its vacatur of Roane's convictions and sentences on Counts Five, Six, and Seven.15

106
The district court concluded that Mr. Baugh had a duty to investigate Roane's potential alibi. As the court explained, Mr. Baugh possessed information suggesting that Roane might be telling the truth about staying at the Howard Johnson hotel the night of Moody's murder — (1) Gina Taylor, an eyewitness, claimed that Roane did not commit the murder; (2) Mr. Baugh had received a detailed account of the alibi from Roane, who had been candid about his participation in other crimes; and (3) Carmella Cooley acknowledged that she had visited a hotel with Roane. See Roane Opinion at 9. Armed with this information, we agree that Mr. Baugh had reason to believe that the hotel records could generate an alibi for Roane, and Mr. Baugh was therefore obliged to make a reasonable investigation of them. See Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052 (explaining that attorney has duty to make reasonable investigation or to make reasonable decision not to investigate). We part company with the district court, however, on its conclusion that Mr. Baugh failed to fulfill this duty.

107
We review de novo the district court's conclusion that Mr. Baugh was constitutionally ineffective, Smith v. Angelone, 111 F.3d 1126, 1131 (4th Cir.1997), and we defer to its findings of fact unless they are clearly erroneous. As the district court found, Mr. Baugh, in keeping with his obligation to investigate: (1) interviewed Cooley, who stated that she once accompanied Roane and Reavis to the Howard Johnson but could not verify the date; (2) concluded that Cooley's ignorance of the date and apparent hostility would make her a poor witness; (3) thereafter contacted the Howard Johnson and asked for records of Linwood Chiles renting a room on the evening of January 12, 1992; (4) went to the hotel himself and attempted to locate the records; (5) limited his search to the name "Linwood Chiles," and searched only for records from January 12, 1992; and (6) found no record of Linwood Chiles being registered at the hotel on the evening of January 12, 1992. Roane Opinion at 5. At this point, Mr. Baugh made the strategic choice to focus on Roane's misidentification defense, with Gina Taylor as his lead witness.

108
The district court concluded that Mr. Baugh's investigation of the alibi was constitutionally insufficient because he "did not follow through and seek the records with the vigor demanded by the situation." Id. at 9. According to the court, "reasonably competent counsel would have filed a subpoena demanding all records held by the hotel pertaining to a Mr. Chiles for January of 1992 or spent a few hours going through all the records at the hotel to assure himself that no records corroborative of his client's alibi existed." Id. With all respect to the district court, we disagree.

109
As the Supreme Court has explained, a criminal defense lawyer possesses a duty to conduct a pretrial investigation that is "reasonable [ ] under prevailing professional norms." Strickland, 466 U.S. at 688, 104 S.Ct. 2052; see also Wiggins v. Smith, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). And the strategic decision of Roane's lawyer on the extent of his investigation into the alibi defense "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691, 104 S.Ct. 2052; see also Byram v. Ozmint, 339 F.3d 203, 209 (4th Cir.2003) (same); Tucker v. Ozmint, 350 F.3d 433, 441-42 (4th Cir.2003) (same). We are obligated by law to make "every effort to avoid the distorting effects of hindsight," Strickland, 466 U.S. at 689, 104 S.Ct. 2052, and we should evaluate Mr. Baugh's performance "from counsel's perspective at the time of the alleged error and in light of all the circumstances...." Kimmelman v. Morrison, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

110
Applying these principles to this situation, Mr. Baugh's performance was constitutionally reasonable and thorough. He interviewed Carmella Cooley, who could not remember when she stayed at a hotel with Roane. He called the hotel and requested records of Linwood Chiles from the only relevant night — the night of the murder. And when that search was not fruitful, he went to the hotel and searched for the records himself. Only after this final step in his investigation did Mr. Baugh turn to and focus on Roane's misidentification defense. In these circumstances, we decline to act as a Monday-morning quarterback and second-guess Mr. Baugh's efforts, simply because we are now armed with more information and the benefit of hindsight.

111
Furthermore, the authorities relied upon by the district court miss the mark, involving situations in which a lawyer has failed to investigate a defense at all or has performed an investigation so minimal that no strategic reason could be given for the failure to investigate further. See, e.g., United States v. Russell, 221 F.3d 615, 621 (4th Cir.2000) (finding ineffective representation when lawyer failed to investigate defendant's criminal record after defendant advised counsel that his convictions had been overturned); Hooper v. Garraghty, 845 F.2d 471, 474-75 (4th Cir.1988) (explaining counsel deficient in failing to investigate insanity defense, after learning from client, client's family, and prison psychologist of client's insanity); Hoots v. Allsbrook, 785 F.2d 1214, 1219-20 (4th Cir.1986) (finding lawyer's decision not to interview eyewitnesses unreasonable); Nealy v. Cabana, 764 F.2d 1173, 1174 (5th Cir.1985) (finding counsel ineffective in failing to seek evidence from witnesses when client claimed those witnesses committed crime). Unlike the circumstances underlying those decisions, this case does not involve a situation where counsel neglected to investigate, or where his investigation was so cursory that we can now — eleven years on and with the benefit of hindsight — declare it constitutionally unreasonable.

112
As the Sixth Circuit aptly explained in Coe v. Bell, 161 F.3d 320 (6th Cir.1998), what the lawyer did not miss is "just as (or more) important as what the lawyer missed." Id. at 342. Here, Mr. Baugh was diligent and highly effective in his representation of Roane during this litigation — he conferred with Roane, he investigated the crime scene, he located an eyewitness to the Moody murder who pro-vided a physical description of a murderer dissimilar to Roane, he learned that Moody's mother had advised the police that another man had been searching for Moody hours before his murder, and he aggressively and professionally cross-examined the Government's witnesses. Mr. Baugh investigated the possible Moody alibi — a weak one at that — but when the investigation proved unfruitful, he put on a strong misidentification defense. According a "heavy measure of deference" to Mr. Baugh, as we must, his representation of Roane was not constitutionally ineffective. We therefore reverse the vacatur of Roane's convictions and sentences on Counts Five, Six, and Seven.

V.

113
Pursuant to the foregoing, we affirm the award of summary judgment to the Government in Nos. 03-25, 03-26, and 03-27, and we reverse the district court's award of relief to Roane in No. 03-13.

AFFIRMED IN PART AND REVERSED IN PART

Notes:

1
Pursuant to § 2255 of Title 28, a federal prisoner claiming his "sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside or correct the sentence."

2
On Count Five, Roane was convicted of killing Moody while engaged in or working in furtherance of a CCE, in violation of 21 U.S.C. § 848(e)(1)(A). On Count Six, Roane was convicted of using a firearm in relation to the killing of Moody, in violation of 18 U.S.C. § 924(c). And on Count Seven, Roane was convicted of killing Moody in order to maintain or increase his position in a racketeering enterprise, in violation of 18 U.S.C. § 1959

3
Roane does not appeal the court's rejection of his claim of actual innocence

4
In Part III of this opinion, we spell out and address those issues raised by the Defendants in Nos. 03-25, 03-26, and 03-27. In Part IV, we address the Government's appeal (No. 03-13) from the award of relief to Roane on his IAC claim

5
When all three Defendants have raised the same issue on appeal, we refer to "the Defendants." Otherwise, we identify by name the defendant raising a particular issue

6
In the Talley murder, Tipton and Roane had driven Douglas Talley to Richmond's southside in January 1992, where Tipton stabbed Talley eighty-four times in the head, neck, and upper body. In the Stoney Run murders, Cory Johnson and Tipton, in February 1992, shot into Linwood Chiles's stationwagon, killing Chiles and Curtis Thorne, and seriously wounding the Greene sisters, Priscilla ("Pepsi") and Gwen

7
The Defendants raise four other claims that were already addressed and rejected on direct appeal. Those claims are: (1) Defendants' contention that they were denied their rights to "justice without discrimination," in violation of 21 U.S.C. § 848(o) and the Fifth and Eighth Amendments, see Tipton, 90 F.3d at 891 n. 16; (2) Johnson and Tipton's contention that § 848(h) constitutes an unconstitutional delegation of legislative authority to prosecutors by allowing them to allege non-statutory aggravating factors, see id. at 895; (3) Johnson and Tipton's claim that the evidence at trial was insufficient to show that they supervised five or more persons, as required by § 848, see id. at 890; and (4) Johnson and Tipton's claim of misconduct by juror Cooke due to mid-trial publicity, id. at 891 n. 16. Because the Defendants have not pointed to any change in the law that warrants our reconsideration of these claims, we agree with the district court that they cannot relitigate these issues. See Opinion at 2-3; see Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir.1976) (explaining that defendant cannot relitigate issues previously rejected on direct appeal).

8
The Defendants also maintain that, pursuant toRing v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), their death sentences are constitutionally invalid under the Fifth Amendment because the Indictment failed to allege the statutory aggravating factors under 21 U.S.C. § 848(n)(1)-(12) that define eligibility for the death penalty. See Ring, 536 U.S. at 589, 122 S.Ct. 2428 (explaining that a capital defendant is entitled, under the Sixth Amendment, to a jury determination of any fact that increases the maximum penalty from life imprisonment to death); United States v. Higgs, 353 F.3d 281, 297 (4th Cir.2003) (explaining that Ring dictates that any factor required to be submitted to the jury must be included in the indictment pursuant to the Fifth Amendment Indictment Clause). After oral argument in this case, the Court held that "Ring announced a new procedural rule that does not apply retroactively to cases already final on direct review." Schriro v. Summerlin, ___ U.S. ___, ___, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004). And although Schriro involved the Sixth Amendment aspect of Ring, its reasoning — that Ring is procedural and does not classify as a rule worthy of retroactive effect — applies equally here.

9
Because we have already considered Defendants'J.E.B. claim on direct appeal and therefore will not reconsider it, we do not reach the district court's conclusion that the claim was defaulted by Defendants' failure to raise it at trial. See Opinion at 12.

10
InRichardson v. United States, 526 U.S. 813, 818, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), the Court assumed, without deciding, that the necessary number to make up a "continuing series" is three. The parties do not dispute this number here.

11
Johnson and Tipton also maintain that the trial court erred in failing to instruct, and that counsel were ineffective in failing to request an instruction, that the Government must prove "management" in order to satisfy the CCE statute's "organizer" or "supervisor" element. This contention ignores our precedent that proof that a CCE defendant exercised some degree of control over others is not required to show that he acted as an organizerSee Butler, 885 F.2d at 201. Even if proof of control were required, the trial court properly instructed the jury that supervision constitutes the "exercise of power and authority by a person who occupies some position of management." Accordingly, this contention is without merit.

12
Johnson and Tipton also submitted affidavits that Greg Scott lied when he: (1) said that he grew up at 155th and Amsterdam in New York; and (2) described the New York Boyz as a gang. The district court found that these statements simply constitute differences of opinion, rather than statements of factSee Opinion at 33. Johnson and Tipton do not contest this finding on appeal.

13
The district court alternatively held that the Defendants were precluded from further discovery by their failure to comply with Federal Rule of Civil Procedure 56(f), which requires a civil litigant opposing summary judgment to attest in an affidavit that he cannot oppose summary judgment without conducting discovery. We need not reach this basis for denial of discovery because the court did not abuse its discretion in finding that the Defendants had failed to demonstrate good cause

14
See Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Witherspoon authorized a voir dire inquiry to determine whether a potential juror would always refuse to impose the death penalty. Conversely, a "reverse-Witherspoon" voir dire inquiry is utilized to determine the existence of pro-death-penalty bias on the part of a prospective juror. See Morgan v. Illinois, 504 U.S. 719, 729-34, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

15
Because Mr. Baugh's performance was not deficient underStrickland, we need not decide whether his performance prejudiced the defense. See Williams v. Kelly, 816 F.2d 939, 946-47 (4th Cir.1987). We express our considerable doubt, however, on whether prejudice could have ensued here. The court found the testimony of all three witnesses who implicated Roane in the Moody murder — Berkley, Davis, and Pepsi Greene — to be credible and corroborated by physical evidence. And Greene's testimony was deemed to be "particularly compelling." Roane Opinion at 4. Conversely, the court found the testimony of the potential alibi witnesses to be much less credible — Reavis's testimony was "flat and unpersuasive," and she would not have testified at trial anyway; Roane's testimony was "tenable" but "not compelling"; Rowe's testimony was "not credible" and "would carry no weight with a jury"; and Cooley could not remember the date on which she went to a hotel with Roane. Id. at 5-7. It would be difficult for this testimony (not to mention the fact that Roane would have been subject to cross-examination about the other murders and his extensive criminal record), plus one motel receipt, in someone else's name, placing Roane a mere two miles away from the murder scene, to create a reasonable probability that, but for the lack of such evidence, "the result of the proceeding would have been different." Strickland, 466 U.S. at 689, 104 S.Ct. 2052.